UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

GRADY ALVIN WILKEY, JR.,

                 Petitioner,                    Case No. 1:05-cv-588

v.                                       Honorable Paul L. Maloney

KURT JONES,

                 Respondent.

_____/

## REPORT AND RECOMMENDATION

      This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254.  Petitioner is serving a term of life imprisonment, imposed by the Van Buren County Circuit

Court on October 28, 2002, after a jury convicted Petitioner of first-degree felony murder, MICH.

COMP. LAWS § 750.316(b).    In his *pro se* petition, Petitioner raises four grounds for relief, as

follows:

    I.      THE TRIAL COURT VIOLATED APPELLANT'S DUE PROCESS
             RIGHTS BY ADMITTING THE UNRELIABLE HEARSAY STATEMENT
             OF THE DECEDENT'S WIFE THAT DID NOT QUALIFY AS FORMER
             TESTIMONY OR UNDER THE "CATCH-ALL" HEARSAY EXCEPTION.

    II.     DEFENSE COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE IN
             FAILING TO OBJECT TO THE PROSECUTOR VOUCHING FOR THE
             CO-DEFENDANT'S CREDIBILITY BY ELICITING THAT THE
             PROSECUTOR HAD ALREADY ALLOWED THE CO-DEFENDANT TO
             PLEAD GUILTY BEFORE TRIAL IN EXCHANGE FOR "TRUTHFUL"
             TESTIMONY.

    III.    DEFENSE COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE IN
             FAILING TO OBJECT OR MOVE FOR A MISTRIAL AFTER THE CO-
             DEFENDANT DISCLOSED THAT APPELLANT WAS INVOLVED

WITH THE CO-DEFENDANT IN OTHER UNRELATED HOME INVASIONS.

IV.    DEFENSE COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE IN ELICITING APPELLANT'S INADMISSIBLE PRIOR CONVICTION FOR FELON IN POSSESSION OF A FIREARM.

Respondent has filed an answer to the petition (docket #9) stating that the grounds should be denied. Upon review and applying the AEDPA standards, I find that all grounds of the petition lack merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

The state prosecution arose from a breaking and entering in January 1990 at the home of Clyde and Catherine Tellas, which resulted in the shooting death of Clyde Tellas. Petitioner was charged with one count of first-degree felony murder, and following a preliminary examination on May 10, 2002, he was bound over on the charge. Petitioner was tried before a jury beginning October 1, 2002, and concluding on October 3, 2002.

The Michigan Court of Appeals decision included a lengthy recitation of the facts of the case, and Petitioner has not disputed any portion of that recitation in his habeas petition. The Court therefore hereby adopts the state court's factual description:

> The focus of the trial was on the identity of the perpetrator. Defendant maintained that he did not commit a breaking and entering at the Tellas home, nor did he shoot Mr. Tellas. Defendant testified that he was nowhere near the crime scene at the time of the shooting. The murder occurred in January 1990, and although defendant had been a suspect from the beginning, along with a number of other possible suspects, defendant was not arrested and tried until 2002.
>
> On January 15, 1993, the prosecutor conducted a deposition of eighty-two year old Mrs. Tellas in order to preserve her testimony for future use in any criminal proceeding should the offender be arrested. We note that attorney Paul Hamre, now

- 2 -

a sitting judge on the Van Buren Circuit Court, was appointed by the court to appear at the deposition and conduct cross-examination, representing the interests of any future defendant in the case and protecting that defendant's constitutional rights. A transcript of the deposition was read to the jury during defendant's trial, which defendant alleges on appeal was improper because it constituted hearsay without exception.

Mrs. Tellas testified that in the early morning hours of January 27, 1990, a little after midnight, she and her husband were watching the Tonight Show in their living room. The only light on in the house at the time was a light that hung over Mr. Tellas' chair, and the room was also lit somewhat by the brightness beaming from the television. The couple heard a loud noise coming from the backdoor, and when they stood from their chairs and turned to see what was happening, they saw a stranger standing in a doorway between the dining room and the kitchen. Mrs. Tellas stated that the individual had a gun in his hand, was dressed completely in dark clothes, and had a dark ski mask over his face. Mrs. Tellas testified that she was not wearing her eye glasses at the time the crime transpired, and that she was about eight to ten feet away from the perpetrator when he was standing in the doorway. Counsel had Mrs. Tellas remove her glasses in the deposition to test her sight, and she indicated that she could not see that well at a distance of eight to ten feet. Her eyesight was worse at the time of the deposition, but Mrs. Tellas stated that her eyesight was also fairly poor at the time of the crime.

The intruder pointed the gun at the couple and stated: "I want all your money." Mrs. Tellas believed the intruder was a white male on the basis of his voice, although she later acknowledged that it was possible he was not Caucasian. Mrs. Tellas testified that the gun did not look like a shotgun, but it was not a pistol either. It was longer than a pistol, and may have been a sawed off weapon. The intruder was cocky and a "smart aleck," and he was very steady and appeared not be scared. After the money demand was made, Mrs. Tellas walked by the perpetrator, down the hall, and headed toward Mr. Tellas' bedroom, thinking that her husband had some money in a dresser drawer; Mr. Tellas followed, as did the intruder. Once in the bedroom, Mrs. Tellas opened her husband's drawer to look for money, and she saw Mr. Tellas' pistol. Mr. Tellas' pistol was not loaded. Ammunition clips were taped to the side of the weapon because Mr. Tellas, a former auxiliary police officer in Detroit, did not believe in keeping a loaded gun in the house. Mrs. Tellas thought possibly the gun was loaded.[2] Her intention when she went to the dresser drawer was to find some money. Mr. Tellas typically kept his billfold in the drawer.

Mrs. Tellas picked up her husband's gun while in his bedroom, at which time the intruder and Mr. Tellas were standing near the bedroom doorway and an adjacent bathroom with the intruder holding his weapon on Mr. Tellas. Mrs. Tellas began moving toward her husband, attempting to give him the gun while trying to conceal

the weapon with her leg.  The intruder saw the gun and demanded that the weapon be put down.  The record is unclear whether Mrs. Tellas herself laid the gun down, or actually handed the gun to her husband; she made statements supporting both versions, although ultimately she asserted that she put the gun down on a dresser. Regardless, as the Tellas' gun was being handled, and soon after the intruder demanded that the gun be dropped, the intruder fired a shot, striking Mr. Tellas in the head.  The intruder then immediately raced out of the home without saying another word.

Mrs. Tellas described the intruder as being about 5' 8" or slightly taller, and he was not fat but rather had a slim build.  She did not detect any alcohol on his breath, nor did she see or hear anything that would suggest that the intruder was drunk or high.  Mrs. Tellas did not see any of the intruder's skin.  She believed that he was a young man based on how he walked.  The intruder did not give any indication that he was familiar with the Tellas' home.  Mrs. Tellas did not know the identity of the intruder.  She did testify that someone had cut a phone wire such that she could not telephone from one of the phones; however, whoever cut the wire missed another phone wire that allowed her to use another phone in the house. Counsel, in a very respectful manner, asked questions of Mrs. Tellas to show that she was of sound mind, e.g., what is the date, and she answered appropriately. Attorney Hamre opined at the close of the deposition that, although he could make no judgment as to the truth of her testimony, Mrs. Tellas "was not easily confused and that despite her advanced age of 82 years old, appeared to fully understand the proceedings and all the questions that were asked."  The prosecutor concurred.

We now turn to the trial testimony.  A nearby neighbor, Doug Monacelli, testified that he was looking out of his kitchen window around the time of the murder and saw a white person with what appeared to be a gun, possibly a rifle, standing in Monacelli's side yard. He was unable to tell whether the person was male or female. He immediately called the Michigan State Police. Monacelli could not identify the individual, nor give any physical characteristics other than the person appeared to be white.

A responding South Haven police officer testified that he removed a bullet casing that was lying by Mr. Tellas' left knee.  On cursory inspection, the officer did not see signs of forced entry.  The South Haven police, who were merely providing initial assistance, turned over the investigation to the state police.

A canine handler for the state police testified that his tracking dog was able to track a scent from the Tellas' home to Monacelli's home.  From there, the dog tracked to another residence, the Smith home, but then tracked back to Monacelli's house.  The canine officer was not involved in questioning any one at the Smith residence.  From Monacelli[']s house, the dog tracked a scent to another residence,

- 4 -

an A-frame house (hereinafter the "Dell" residence), and again, the officer was not privy to any interviews at the residence. The dog was unable to go any further from there.

The prosecution next called William Councilor who was in his early twenties at the time of the crime. Councilor testified that defendant had been a friend of his in 1990. Councilor knew where Mr. and Mrs. Tellas lived; they resided about a half a mile from his residence. Councilor acknowledged that he was contacted by the police about the murder shortly after the homicide, and that he, defendant, and Richard Brockless, another friend, had been rumored to have been involved in the murder. On the night of the murder, Councilor, defendant, and Brockless were at Councilor's home sitting around drinking alcohol and smoking marijuana. Councilor testified that the three of them discussed finding a house to break into, and that defendant suggested the Tellas' house. Defendant thought that, because the couple were elderly and did not get around much, they might have money and jewelry.

Councilor further testified that he became uncomfortable when defendant started talking about bringing a gun along to the Tellas' home. Councilor indicated that he himself had never used a gun before while committing previous break-ins. Brockless and Councilor tried to talk defendant out of bringing a gun. Subsequently, defendant, and then later Brockless, left Councilor's home about 10:30 and 11:30 p.m., respectively, but Councilor was unaware if the two had any definite plan to actually carry out the break-in. Defendant told Councilor that he was going home. Councilor had made a statement to police that Brockless left first that night instead of defendant. He admitted that he may have been confused. Councilor did not see defendant or Brockless again that night. He stated that, although the three of them wrestled around as part of horseplay that evening, no one got hurt; Councilor saw nothing wrong in the way defendant walked on leaving.[3]

Councilor saw defendant the following morning when Councilor's mother gave him and defendant a ride into South Haven so that defendant could take a bus from South Haven to Saginaw to visit friends and family. Councilor and defendant had made these plans previously. Defendant was limping that morning, and he told Councilor that he hurt his ankle during horseplay at Councilor's home the night before. Councilor did not learn of the murder until later in the day. He testified that defendant acted normally the morning after the murder.

Councilor further testified that he did not have any conversation with defendant about the murder until about two years later. Defendant told Councilor that defendant "went into the house and the old man there pulled a gun on him so he shot him and ran out." Defendant referenced the Tellas' home. Councilor acknowledged that he had never been charged with anything related to the crime, and that he was aware that Brockless made a statement that Councilor had left the home

together with Brockless and defendant the night of the murder. Councilor denied ever leaving his home that night. He testified that he was aware that the statute of limitations barred any charges against him outside of murder.

On cross-examination, Councilor admitted that he had been angry with defendant before the crime because defendant had engraved a 666 pentagram tattoo on Councilor's shoulder instead of the skull and cross bones that Councilor expected. He testified that he was upset at first but got over it. Councilor also acknowledged that he had been a suspect in the murder for twelve years. On redirect, Councilor recalled that he had seen defendant carrying a sawed-off weapon around the date of the murder, and that defendant cut the gun off so he could fit it in the sleeve of his jacket so as to carry it around.

Defendant's cousin next testified that around the date of the crime, defendant visited him in Saginaw, and that defendant had a kind of leg brace on because of a sprained ankle. Defendant told him that the injury was the result of slipping and falling on ice.

Christy Czarnowski testified that she was defendant's former girlfriend having met him in 1994, and that they subsequently lived together for about three years in Grand Rapids. She stated that after they broke up, the state police questioned her about the murder. Czarnowski had been aware of the rumors circulating about the murder and the possible involvement of Brockless and defendant. Initially, defendant denied any involvement. Periodically throughout the relationship, and after the initial denials, defendant made the statement that Czarnowski did not know what it was like to have killed a man, and that he and Brockless had committed a breaking and entering together. She recalled an incident in 1995, where a Polaroid picture of an elderly man was sent to their Grand Rapids' home with a statement underneath saying: "I remember you, do you remember me," or "I remember you, fucker." Defendant turned a sickly, green, pale color when Czarnowski confronted him with the picture, but he assured her that there was no reason to worry. Czarnowski did not know who sent the picture; there was no return address and it was postmarked in Grand Rapids.

Czarnowski recalled another time when defendant stated, "I wish he never would have went for the gun." Czarnowski told detectives that defendant had made the following statements in her presence: "I killed a man, I've got to live with it [,]" and "they should have never went for the gun." Defendant admitted to her that he never would have shot but the old man surprised him.

On cross-examination, Czarnowski, when faced with a prior statement made by her pursuant to an investigative subpoena wherein she stated that defendant had never in fact told her that he killed someone, she explained that "[h]e never bluntly

flat out said quote for quote, I have killed someone or I have killed a name of a person."

Anita Gray, a resident of the area around the crime scene in 1990, testified that she knew Councilor, Brockless, and defendant, and that they would hang out with her and her now deceased husband Joe Wescott. On the same day as the crime, Wescott loaned Brockless and defendant two .22 caliber weapons for hunting. One was a Remington rifle; the other was a rifle with a broken down barrel or a modified .22 caliber rifle. Gray believed that both weapons were subsequently returned.

Gray testified that about a week after the murder, she, Wescott, Brockless, and defendant were sitting around drinking when defendant confessed to the breaking and entering and the murder. Gray testified as follows:

[H]is statement was that when he asked for more money, the gentleman would not give him any more money and refused to give him any more money and he turned around and walked away from him and he popped him in the back of the head.

Gray further stated that on the night of the murder, in the early morning hours, Brockless came to her home, asking to take a shower and spend the night, and she refused his request. Brockless then left the residence.

Dana Averill, a detective sergeant for the state police at the time of the murder, testified that he responded to the crime scene and talked to Mrs. Tellas. Mrs. Tellas told Averill that the intruder was about 5' 10" to 6' tall, had a medium build, weighed about 150 pounds, was a white male, wore dark clothing, and was probably in his early twenties. She could give no facial details as the intruder was masked. However, she described the intruder as having dark hair, and when asked how she knew this in light of the mask, Mrs. Tellas responded that possibly the mask or covering only covered the intruder's mouth and nose area as opposed to a full pullover mask. As part of Averill's investigation, he interviewed defendant several times. Defendant told Averill that on the night of the murder, he was at Councilor's house and hanging out with Brockless and Councilor, where he hurt [h]is ankle during horseplay, and he left the house at around 11:30 p.m. Defendant stated that in the early morning following the crime, between 4:00 and 6:00 a.m., he went to the hospital with his mother to have his ankle treated.

Averill further testified that he interviewed Councilor's mother, who was present at the Councilor home on the night of the crime, and she indicated that defendant had left the home for a period of time and returned. When Averill confronted defendant with this information, defendant changed his story by saying "oh yeah, that's right." He now remembered leaving the Councilor house at around

10:00 p.m. to get something to eat at his home, and then defendant returned to the Councilor home. Averill stated that, as to the casing found at the crime scene, there was no definite opinion with respect to the particular type of weapon used. Averill indicated that they had no weapon to compare the casing to; however, a .22 caliber weapon was definitely used in the crime.

Averill interviewed some of the persons at the Dell residence and ruled them out as suspects at the time. Two of the persons at the Dell residence, though, fit the general description of the perpetrator as described by Mrs. Tellas. A photographic lineup was presented to Mrs. Tellas, which lineup included defendant, but she could not identify the intruder. Averill testified that defendant was always cooperative during the investigation and always denied any involvement in the crime.

The next witness to testify was Christopher Brady, who lived in the general area of the crime scene and who knew defendant, Brockless, and Councilor. In January 1990, a few days before the murder, defendant and Councilor visited Brady and showed him a .22 caliber rifle with the butt sawed off. Brady further testified that he believed that defendant told him at one time that he had done yard work at the Tellas' home; however, Brady acknowledged that he made a statement to police early in the investigation that he did not believe any of the suspects did work at the Tellas' home.

Carla Brady, who was Christopher Brady's wife, testified that she knew defendant, Brockless, and Councilor at the time of the crime, and she confirmed the testimony of her husband that defendant and Councilor visited them just prior to the murder and displayed a shortened .22 caliber rifle. She believed that defendant was carrying the gun.

Jeff Wallis, a detective sergeant for the state police who investigated the crime, testified that he photographed a ditch with frozen water in it, and it appeared that someone had stepped onto the frozen water and broken through the ice. This ditch was in the same general area over which the police dog had tracked a scent. Wallis confirmed the testimony of Detective Averill that defendant had stated that he left the Councilor home around 11:30 p.m. and that Brockless left around 10:30 p.m. on the night of the crime, and that the story later changed that defendant left around 10:00 p.m. to get something to eat at home and then subsequently returned. Defendant told Wallis that he hurt his ankle during horseplay while at Councilor's home, and that his mother took him to the hospital around 4:00 a.m. on January 27th because the injury was quite painful.

Wallis testified that he confronted defendant about displaying a .22 caliber rifle to the Bradys, and defendant denied that the incident ever occurred. Wallis also

confirmed that a .22 caliber shell casing had been recovered from the Tellas' residence.

Sheryl Hough testified that she knew defendant, Brockless, and Councilor at the time of the crime, and that a few days after the murder, she was riding around in defendant's car with the both of them. Brockless made statements indicating that he had knowledge of the murder and that defendant wound up shooting a man, and defendant nodded in agreement to Brockless' statements. Defendant commented "about the stupid asses cutting the wrong wire," which Hough took as a reference to Brockless and Councilor. Hough admitted that defendant himself never asserted that he killed anyone, and that she used drugs, would lie to the police depending on the circumstances, and that she, Brockless, and Councilor were drinking when the incriminating statements were made.

David Mitchell, who was brought over to the courtroom from the county jail and who acknowledged an extensive criminal history (19 years in the penal system), testified that he agreed to testify in return for a recommendation, not a guarantee, by the prosecutor that no additional prison time be added to a 2 to 7 ½ year sentence for a recent charge of absconding on bond. He conceded that he was looking for a better deal than that given in return for his testimony. Mitchell testified that he had been in a holding cell with defendant in the county jail, and that defendant mentioned the circumstances of his case to which Mitchell responded that he also had previously been involved in an armed robbery. This apparently made defendant comfortable enough to confide in Mitchell, and defendant proceeded to admit to the break-in and shooting of Mr. Tellas. Mitchell's account of defendant's description of what occurred closely paralleled Mrs. Tellas' account of the crime. Additionally, Mitchell testified that defendant did not implicate anyone else but himself. Mitchell stated that he had no knowledge of the crime other than what was conveyed to him by defendant.

Next to testify was Brockless. In return for his "truthful" testimony at defendant's trial, the prosecutor agreed to accept a plea to breaking and entering with a sentence recommendation of 5 to 10 years' imprisonment. Brockless first indicated that he had a son by defendant's sister, that he was now 32 years old, and that he was about 5' 10" and weighed 180 lbs. He weighed about the same at the time of the murder, and his hair was blond. Going back to the night of the crime, Brockless testified that he, defendant, and Councilor, while at Councilor's home drinking beer and playing games, talked about burglarizing the Tellas' home. Defendant made the suggestion as to what home to burglarize, and defendant suggested the use of a firearm. Both Brockless and Councilor thought it was stupid to bring a gun and tried to talk defendant out of it. Defendant subsequently left, and Brockless left sometime later. When defendant left Councilor's home, he had no ankle or leg injury. Brockless later met up with defendant at defendant's home, and they both walked

back to Councilor's home.  The three of them then proceeded to walk over to the Tellas' house, and defendant was carrying a .22 caliber rifle with the butt cut off. Once there, they peered in through the windows and noticed the elderly couple, and defendant indicated that it would be easy to just go in and rob them.  Defendant cut a phone line, and at that point, Brockless decided he was not going to go through with it because he was worried about the fact that people were home and defendant had a gun. Brockless and Councilor walked over to a tree line away from the house.

Brockless could see defendant on the back porch of the Tellas' home; he did not see the gun at that point, nor did he see defendant with a mask on, but Brockless recalled that defendant showed him a mask while walking down to the house, although he was not one-hundred percent certain.  Brockless and Councilor started walking toward the road, and as defendant pulled the door open at the rear of the house, there was a loud banging noise, and Brockless and Councilor ran away.  At the time, Brockless did not know that anyone was shot.  They went to Councilor's home, where Councilor entered his home through his bedroom window, and Brockless then eventually proceeded to the Wescotts' home, but they would not let him stay there.  He ended up sleeping in a car at the Bradys' residence.

A week or so later, Brockless talked with defendant, and defendant confessed to killing that "old guy."  Defendant indicated that it was an accident, and that the "lady" had handed Mr. Tellas a gun.  Defendant then ran from the home and threw the gun in the woods.  Brockless acknowledged that he lied to police from the beginning about his own involvement because he was scared and did not want to go to prison.  He also stated that he had mentioned the events of that night to various persons over the years.

On cross-examination, Brockless testified that he had been arrested and charged with first-degree felony murder for the death of Mr. Tellas and later accepted the plea offer.  Cross-examination focused on the plea agreement, and how much it benefited Brockless to testify against defendant, and it focused on the numerous lies and half-truths that Brockless made to the police over the years.

Daniel Blade, who met and befriended defendant in Grand Rapids years after the murder, testified that while they were playing cards and drinking, defendant admitted "he had killed a gentleman and he put a slug in the guy's head."  Defendant told Blade that he shot an elderly man twice in the head with a .22 caliber, sawed-off rifle after entering his house and demanding money from the man and his wife. Defendant indicated that the shooting occurred in the South Haven area.  Blade was unaware of the murder until told by defendant, and Blade had never known Brockless.

On cross-examination, Blade conceded that defendant suggested that he alone was not involved in the crime and defendant used the word "we" when describing the crime. Blade was confident though that defendant suggested that it was defendant himself who did the shooting. Blade acknowledged that he was a professional confidential informant who worked with many police agencies on numerous cases. On redirect, Blade testified that he only received money for traveling expenses from the state police related to the defendant's case.

Kenneth Daniel, a commander for the state police cold case team, testified that the .22 caliber rifle used in the shooting was never recovered. A .22 rifle with a scope, given to police by the occupants of one of the homes on the route tracked by the police dog,[4] was examined and determined not to be the murder weapon. Daniel testified that in numerous statements, Brockless consistently identified defendant as wielding a weapon during the break-in and shooting Mr. Tellas. Daniel also testified that during the course of the investigation, no one had claimed to have heard a confession to the crime from Councilor.

The prosecutor rested, and defendant moved for a directed verdict, which was denied. Defendant then took the stand on his own behalf. We find it unnecessary to go into great detail regarding his testimony because it essentially reflected a total denial of any involvement in the crime. Defendant testified that, while he was at Councilor's home on the night of the murder, there was no discussion whatsoever about committing any breaking and entering. He asserted that when he left Councilor's home between 10:30 p.m. and 11:00 p.m., he went straight home, drank a beer with his now deceased father while watching television, fell asleep, and subsequently awoke in pain and went to the hospital with his mother for his ankle injury, which he sustained during horseplay with Councilor and Brockless.[5] Defendant suggested that Brockless or possibly Councilor may have been shooter, and that the parade of witnesses put on the stand by the prosecutor were all lying, for various reasons, when they testified as to incriminating statements made by defendant or matters involving a .22 caliber rifle. Defendant denied having a .22 caliber, sawed-off rifle, although he admitted that many guns passed through his hands in 1989-1990. Defendant flatly denied killing Mr. Tellas and denied ever being at the Tellas' home. He testified that he and Councilor were both 6' 1", and Brockless more closely fit the description given by Mrs. Tellas. Defendant testified that he was currently about 175 lbs., and, when the prosecutor asked whether he would dispute a record showing that defendant weighed 155 lbs. in 1990, defendant did dispute the assertion.

Defendant's testimony was followed by two character witnesses who very briefly opined that defendant was an honest person.

[2] She did not notice that the clips were taped to the side of the gun until later when she attempted to hand the gun to Mr. Tellas.

[3] This is relevant, as will be discussed below, to a claim by defendant that he hurt his ankle during horseplay at Councilor's house, which explained why he went to the emergency room for treatment in the early morning after the night of the crime.

[4] The record is unclear whether this was the Smith, Monacelli, or Dell residence.

[5] On cross-examination, defendant stated that he went home briefly to eat, returned to Councilor's home for a few seconds, and the returned to his own home.

(3/23/04 Mich. Ct. App. Op. ("MCOA Op.") at 1-9, docket #23.)

At the conclusion of trial, on October 3, 2002, the jury found Petitioner guilty of first-degree felony murder.  (Tr. III, 124.)  On October 28, 2002, Petitioner was sentenced to life imprisonment without parole.  (Sentencing Transcript, ("S. Tr."), 4, docket #22.)

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on June 24, 2003, raised the same four issues as raised in this application for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, docket #23.)   By unpublished opinion issued on March 23, 2004, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's conviction.   (*See* 3/23/04 MCOA Op., docket #23.)   Petitioner sought reconsideration, which the court denied on May 24, 2004.  (*See* 5/24/04 MCOA Ord., docket #23.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same four claims raised before and rejected by the Michigan Court of Appeals.  By order entered January 13, 2005, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (See Mich. Ord., docket #24.)

**Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  "Yet, while the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be  instructive in assessing the reasonableness of a state court's resolution of an issue."  *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  The inquiry is "limited to an examination of the legal landscape as it would have

appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir.

- 14 -

1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### Discussion

I.    Confrontation Clause

In his first ground for habeas relief, Plaintiff contends that the trial court violated his rights to due process and to confront witnesses when it admitted the deposition testimony of decedent's wife, Catherine Tellas, under the "catch-all" hearsay exception.

The Confrontation Clause of the Sixth Amendment guarantees the accused the right "to be confronted with the witnesses against him." U.S. Const., Am. VI.  The Supreme Court has long read this right as securing an adequate opportunity to cross-examine adverse witnesses.  *United States v. Owens*, 484 U.S. 554, 557 (1988) (citing *Mattox v. United States*, 156 U.S. 237, 242-43 (1895) and *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)); *Delaware v. Van Ardsdall*, 475 U.S. 673, 679 (1986).   Until March 8, 2004, the test for evaluating Confrontation Clause claims was set forth in *Ohio v. Roberts,* 448 U.S. 56 (1980). In *Roberts,* the Supreme Court articulated a two-pronged test for determining the admissibility of a declarant's out-of-court statement:

> [First], the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability."  Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Id.* at 66.

In addressing Petitioner's claim, the Michigan Court of Appeals applied the standard set forth in *Roberts*, 448 U.S. at 66.  That standard, however, was inapplicable to the instant case. On March 8, 2004, two weeks before the Michigan Court of Appeals' decision, the Supreme Court

abrogated the *Roberts* test in *Crawford v. Washington,* 541 U.S. 36 (2004).[1]  Petitioner sought rehearing in the Michigan Court of Appeals on the basis of *Crawford*, but rehearing was denied. Petitioner also argued *Crawford* to the Michigan Supreme Court, and one justice dissented from the denial of leave and would have remanded the case to the court of appeals for further consideration of the Confrontation Clause issue in light of *Crawford*.  (1/13/05 Mich. Ord., docket #24.)

In *Crawford*, the Supreme Court divided out-of-court statements into two categories: those that are "testimonial" and those that are not.  *Crawford*, 541 U.S. at 60-69.  The Court identified testimonial hearsay as the "primary" concern of the Confrontation Clause.  *Id.* at 53. Testimonial out-of-court statements by witnesses are barred under the Confrontation Clause, unless (1) the witnesses are unavailable, and (2) the defendant had a prior opportunity to cross-examine those witnesses, regardless of whether such statements are deemed reliable.  By contrast, where non-testimonial hearsay is at issue, the Supreme Court found the framers' design afforded flexibility for the development of hearsay exceptions and such an approach would be exempted from Confrontation Clause scrutiny altogether.  *Id.* at 68.

The *Crawford* Court gave a non-exclusive list of examples of "testimonial" statements: "*ex parte* in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits,

---

[1]*Crawford* is not retroactive to cases that were final before the case was decided. *See Whorton v. Bockting*, 549 U.S. 406 (2007); *Dorchy v. Jones*, 398 F.3d 783 (6th Cir. 2005).  However, Petitioner's case was not final when *Crawford* was decided.  Because the Michigan Court of Appeals applied the incorrect standard, its reasoning was contrary to clearly established Supreme Court precedent.

depositions, prior testimony, or confessions"; and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51-52 (internal quotation marks omitted). The deposition of Catherine Tellas was clearly testimonial, as defined in *Crawford*. Petitioner does not dispute that Catherine Tellas was unavailable to testify at trial because she was no longer alive.

Petitioner focuses on the second prong of *Crawford*, contending that he personally had no opportunity to cross-examine Catherine Tellas. However, he does not dispute that an attorney was appointed to represent the interest of any defendant subsequently charged in the case, and the attorney carefully cross-examined Mrs. Tellas. Petitioner has not identified and I have not located a case on all fours with the circumstances present in the instant case. The Tenth Circuit, however, recently addressed a somewhat related claim in *Barger v. Oklahoma*, 238 F. App'x 343, 347 (10th Cir. 2007). In *Barger*, the defendant argued that he did not have a proper opportunity to cross-examine because he had changed counsel between the deposition and trial, and his trial counsel did not have an opportunity to cross-examine the witness. The *Barger* court found the defendant's argument to be unavailing, holding that "the Confrontation Clause provides [defendant] 'only the opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Id.* (quoting *Kentucky v. Stincer,* 482 U.S. 730, 739 (1987)).

Here, because counsel was appointed to represent the as-yet uncharged defendant, Petitioner, through appointed counsel, arguably was provided a sufficient opportunity to cross-examine Mrs. Tellas as required by *Crawford*. I need not and do not reach the question, however. Even assuming that Petitioner's rights were infringed under the Confrontation Clause by the

admission of Mrs. Tellas' testimony, the trial court's error was harmless.  Confrontation Clause

errors are subject to harmless-error analysis.  *See, e.g., Crane v. Kentucky*, 476 U.S. 683, 691 (1986);

*Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *Chapman v. California*, 386 U.S. 18, 21-22

(1967).  On habeas review, a court must assess harmlessness under the standard set forth in *Brecht*

*v. Abrahamson*, 507 U.S. 619 (1993), regardless of whether the state appellate court recognized the

error and reviewed it for harmlessness.  *See Hargrave v. McKee*, 248 F. App'x 718, 728 (citing *Fry*

*v. Pliler*, 127 S. Ct. 2321, 2328 (2007)); *see also Vasquez v. Jones*, 496 F.3d 564, 574-75 (6th Cir.

2007).  The *Brecht* standard requires the Court to consider whether the constitutional error in the

state criminal trial had a "substantial and injurious effect" on the result.  *Brecht*, 507 U.S. at 638.

If upon review of the entire record, the court is convinced that "the error did not influence the jury,

or had but very slight effect," the conviction must stand.  *O'Neal v. McAninch*, 513 U.S. 432, 437-38

(1995); *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

   The Michigan Court of Appeals squarely concluded that any error in admission was

harmless, noting that Mrs. Tellas gave only a vague, general description of the assailant, was unable

to see his face because of the mask, and had very poor eyesight on that night, both because it was

dark and because she was not wearing her glasses.  That conclusion was patently reasonable.  In fact,

Mrs. Tellas' testimony was even more strikingly unhelpful to the prosecution than described by the

court of appeals.  Mrs. Tellas testified that she could not see or describe the assailant because he was

wearing a mask and her vision was poor.  (Tellas Dep., 26.)  On cross-examination, Mrs. Tellas

could not even testify with certainty whether or not the perpetrator was Caucasian, an identification

she earlier made by voice alone.  (*Id.*, 65.)  She described the perpetrator as being thin and about the

same height as her husband, 5' 8", or a little more.  (*Id.*, 61.)  But subsequent testimony revealed that

Petitioner was 6'1" and that Brockless better fit the description given by Mrs. Tellas in her deposition. (Tr. III, 18.) Tellas' testimony therefore helped Petitioner with his defense strategy to implicate Brockless. The testimony also undermined Detective Sergeant Averill's testimony at trial concerning Mrs. Tellas' statement at the hospital on the night of the murder. According to Averill, Mrs. Tellas told him that the assailant was 5'10" to 6' tall. (Tr. II, 50.) Mrs. Tellas' deposition testimony, therefore, assisted Petitioner by undercutting the more damaging description provided by Averill. Further, defense counsel used the height estimate given in the deposition as his first point in closing argument, suggesting that, because most people could tell the difference between someone over six feet tall and someone under six feet tall, Mrs. Tellas's testimony helped to raise reasonable doubt about whether the perpetrator was Petitioner. (Tr. III, 91.) Defense counsel also emphasized in his closing argument that Mrs. Tellas could not identify Petitioner from a photo lineup. (Tr. III, 91.) Even if the jury found Mrs. Tellas' description credible or helpful, that description worked in Petitioner's favor. No part of Mrs. Tellas' testimony could have had a "substantial and injurious effect on the result." *Brecht*, 507 U.S. at 638. The admission of Mrs. Tellas' testimony, therefore, was harmless.

## II.    Ineffective Assistance of Counsel

In his remaining three grounds for habeas relief, Petitioner argues that his trial attorney rendered constitutionally ineffective assistance in three ways: (1) by failing to object to the prosecutor's vouching for the co-defendant's credibility; (2) by failing to object or to move for mistrial after the co-defendant disclosed that Petitioner had been involved with the co-defendant in other home invasions; and (3) by eliciting Petitioner's admission to having been convicted as a felon in possession of a firearm.

In *Strickland v. Washington*, 466 U.S. 668, 687-88  (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

"When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'"  *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697).  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Strickland*, 466 U.S. at 697.  A claim of ineffective assistance of counsel presents a mixed question of law and fact.  Accordingly, the Court

- 20 -

must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

### A. Vouching

Petitioner argues that defense counsel rendered ineffective assistance when he failed to object to the prosecutor's alleged misconduct in vouching for witness Brockless. Counsel's failure to object can form the basis for habeas relief only if the prosecutor's statement was indeed objectionable as vouching.

The federal courts generally have recognized two types of objectionable vouching. *See, e.g., Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008); *Brown v. McKee*, 231 F. App'x 469, 478 (6th Cir. 2007) (citing *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)). The first type impermissibly places the government's prestige behind the witness to bolster the witness' credibility. *Francis*, 170 F.3d at 550; *United States v. Carroll*, 26 F.3d 1380, 1388-89 (6th Cir. 1994); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992). In the second type of impermissible vouching, also known as bolstering, the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt. *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965); *Henderson v. United States*, 218 F.2d 14, 19 (6th Cir. 1955).

Neither type of vouching is involved in this case. Instead, Petitioner objects only to the prosecutor's questions to Brockless about the terms of the plea agreement entered into by Brockless, including the requirement that Brockless provide "truthful" testimony at trial upon pain of voiding the agreement. As the Michigan Court of Appeals found:

> Testimony regarding a plea agreement containing a promise of truthfulness does not, in itself, constitute grounds for reversal. [*People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995).] Such testimony does not insinuate governmental possession of information not heard by the jury, and the prosecutor cannot be taken to have expressed a personal opinion on the witness' truthfulness. *Id.* Here, the prosecutor merely referenced the plea agreement and Brockless' promise to testify truthfully. There was no express or implicit suggestion by the prosecutor that he had information unknown to the jury establishing that Brockless was testifying truthfully. The prosecutor did not express a personal opinion or send a message to the jury with respect to Brockless' veracity.

(MCOA Op. at 12.)   The Michigan Court of Appeals concluded that, "[b]ecause counsel is not required to raise a meritless or futile objection, defendant was not deprived of effective counsel."

The court of appeals' findings and conclusion are entirely reasonable.  The prosecutor made no statement and propounded no question placing the government's prestige behind Brockless or suggesting that the prosecutor had special information about Brockless' credibility.  It is well settled that a prosecutor does not act improperly in introducing a witness's plea agreement, even if it contains a "truthfulness" provision. *See United States v. Beard*, 2008 WL 4899462 at * 2 (6th Cir. Nov. 13, 2008) ("It is not improper vouching for a prosecutor to introduce a witness's plea agreement on direct examination, even if it includes a truthfulness provision."); *accord, United States v. Roundtree*, 534 F.3d 876, 881 (8th Cir. 2008).  Any objection to the prosecutor's comments would have been meritless.  Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel.  *See Chegwidden v. Kapture*, 92 Fed. Appx. 309, 311 (6th Cir. 2004); *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir.1990); *United States v. Wright*, 573 F.2d 681, 684 (1st Cir. 1978).

- 22 -

**B.     Reference to unrelated home invasions**

In his third ground for habeas relief, Petitioner contends that defense counsel was ineffective in failing to object or to move for a mistrial after co-defendant Brockless made references to prior breaking-and-entering offenses (B&Es) the two had committed together.  Before trial, defense counsel moved in limine to exclude any references to Petitioner's prior B&Es and other uncharged offenses allegedly committed by Petitioner.  The prosecutor agreed with the motion and indicated that he had no intention of eliciting such testimony.  He also indicated that he had instructed his witnesses to avoid mentioning either the convictions or other criminal conduct. Nevertheless, he expressed reservations about whether, in light of the lifestyle of the witnesses involved and the nature of their various involvements, such admonitions would be totally successful. (8/23/02 Mot. Tr., 5-6, docket #17.)

At trial, in response to an unobjectionable question by the prosecutor, Brockless mentioned that he and Petitioner had committed prior home invasions:

> Q     [BY PROSECUTOR]: . . . Was there any discussion at all about that, about the fact that there were people home?
>
> A     Yeah, yeah, I guess it did come up after we got up there, you know, it was like there is people there.  We never did B & Es with people home, you know, no guns.

(Tr. II, 143.)  Somewhat later during his testimony, Brockless made a similar unsolicited comment:

> Q     [BY PROSECUTOR]: What did you do at that point in time when you heard that?
>
> A     Well, I was in a daze.  You know, I just kept thinking in my mind, I'm glad that I left, you know, because I told him accidents – that's how accident's [sic] happen, you know, we never did B & Es with no one home, you know, never carried no guns, you know, not that I knew of unless he had one in his pocket.

- 23 -

(Tr. II, 147-48.)  Petitioner argued in the state courts and in his habeas petition that the admission of evidence of other bad acts without objection permitted the jury to consider improper character evidence in violation of MICH. R. EVID. 404(b) and the Due Process Clause.

      The Michigan Court of Appeals declined to determine whether the failure to object or to move for mistrial was a matter of sound trial strategy under the first prong of the *Strickland* test because it concluded that Petitioner had failed to establish prejudice:

> With respect to the B&Es, there was proper testimony admitted showing that defendant, Brockless, and Councilor were planning to break into the Tellas' home. Two brief references to those same individuals committing other B&Es hardly seems noteworthy; a mistrial would not have been warranted.  Taking this into consideration, along with the strong evidence of guilt, we find no prejudice.

(MCOA Op. at 14.)

      The state court's conclusion represents a reasonable application of the prejudice component of *Strickland*.  Numerous witnesses testified about Petitioner's involvement in the murder.  Both Brockless and Councilor testified about Petitioner's involvement in planning the home invasion, in bringing the gun against their advice, and in shooting the victim.  David Mitchell, a former cellmate at the jail, testified that Petitioner had told him that he had committed the offense, giving a description of the incident that closely paralleled that provided by Mrs. Tellas.  Daniel Blade testified that, some years after the murder, Petitioner admitted to Blade that he had shot an elderly man twice in the head with a sawed-off .22 caliber weapon after entering the man's house and demanding money from the man and his wife.  Sheryl Hough testified that, a few days after the shooting, Petitioner had nodded in agreement with Brockless' statement that the two had knowledge of the murder and that Petitioner had shot a man.  Anita Gray testified that, approximately a week after the crime, Petitioner admitted to the breaking and entering and the murder.  In fact, Petitioner's

testimony and his version of the events conflicted with the testimony of nearly every witness presented by the prosecution, both as to the particulars of the crime and as to other circumstantial evidence. The mention of "B&E's" was fleeting and occurred, in both instances, in passing. Counsel reasonably could have concluded that the jury missed the allusions and that an objection would have drawn attention to them, doing more harm than good. In light of the extensive evidence against Petitioner, the state court reasonably concluded that a mistrial would have been denied and that counsel's failure to object was harmless.

### C.   Prior conviction

In his final claim, Petitioner contends that his trial attorney rendered ineffective assistance when he elicited Petitioner's admission at trial that Petitioner previously had been convicted of being a felon in possession of a firearm:

> Q       . . . Now, also, I'm sure that the Jury is going to want to know some other things about you. In terms of your past, I think that you would be willing to acknowledge that you haven't led the most pristine life.
>
> A       No, I haven't.
>
> Q       In fact, in 1995 I believe it was you were convicted of felon in possession of a firearm, is that correct?
>
> A       Yes, I was.

(Tr. III, 5.) On cross-examination, the prosecutor emphasized the point:

> Q       . . . Now, Mr. McDonagh asked you or pointed out the fact that you haven't led a pristine life necessarily; do you remember that question?
>
> A       Yes, I do.
>
> Q       And you indicated that you had a conviction in 1995 I believe for being a felon in possession of a firearm?

A    Yes.

Q    Okay. . . . By doing that, you're not implying that that's the only thing that you've ever done, is it?

A    No.

(Tr. III, 44-45.)

As with the testimony about the prior B&Es, the Michigan Court of Appeals did not reach the question whether counsel's performance fell below an objective standard of reasonableness. Assuming counsel's performance was improper, however, the court of appeals concluded that the question was not prejudicial.

> With respect to the felon in possession conviction, if it reflected to the jury that defendant possessed and had knowledge of weapons, it was not harmful, in that defendant himself testified that he had possessed many firearms around the time of the murder. The reflection that defendant was a felon gives us more concern, but we still opine, that in light of the overall testimony and strong evidence of guilt, defendant has failed to show prejudice.

(MCOA Op. at 14.)

As previously discussed, the evidence against Petitioner was strong. Among other things, two witnesses testified as to their direct knowledge of Petitioner's involvement, and multiple witnesses testified that Petitioner had admitted or acknowledged that he shot the victim. Under the circumstances, the state court's determination that Petitioner had failed to demonstrate the necessary prejudice constituted a reasonable application of Supreme Court precedent.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Dated:   December 9, 2008                  /s/  Joseph G. Scoville
                                           United States Magistrate Judge


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).