UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

| |
GRADY ALVIN WILKEY, JR., | Case No. 1:05-cv-588
|
Petitioner, | HONORABLE PAUL MALONEY
|
v. | Magistrate Judge Carmody
|
KURT JONES, |
|
Respondent. |
|

---

## OPINION AND ORDER

**Overruling Petitioner's Objection Regarding the Sixth Amendment Confrontation Clause;**
**Overruling Petitioner's Objections Regarding Ineffective Assistance of Trial Counsel;**

**Adopting the Report & Recommendation as Modified;**
**Denying the Petition for a Writ of Habeas Corpus;**

**Issuing a Certificate of Appealability on the Confrontation Clause Ruling Alone;**
**Terminating and Closing the Case**

For the reasons that follow, the court will adopt the Magistrate Judge's Report and

Recommendation ("R&R") with modification and deny Grady Alvin Wilkey, Jr. ("Wilkey")'s 28

U.S.C. § 2254 petition for a writ of habeas corpus.

## Background and Procedural History

The prosecution charged that in 1990, Wilkey committed the state-law felony of breaking

and entering the home of an elderly couple named Clyde and Catherine Tellas – at midnight and in

disguise – pointing a loaded firearm at them, demanding money, and fatally shooting Mr. Tellas in

the head when the couple tried to defend themselves in their home.  At trial in Michigan state court in 2002, Wilkey testified that at the time of the killing, he was nowhere near the Tellas's home.  But numerous associates of Wilkey testified that he had told them details of the crime, complained about an aspect of its execution (the incompetent cutting of the home's telephone "land lines"), and remarked that he wished that the old man he had murdered had not tried to use a gun in self-defense.  In addition, the surviving victim, Mrs. Tellas, died before Wilkey's trial, but the prosecution had taken her deposition *de bene esse.*  The trial court permitted the prosecution to read the deposition transcript to the jury.  The jury convicted Wilkey of first-degree felony murder, and the judge sentenced him to life in prison with no possibility of parole.

On appeal, Wilkey raised the same four issues that he raises in the instant petition.  First, he contended that the trial court committed reversible error by admitting Mrs. Tellas's deposition testimony.  Namely, Wilkey contends that Mrs. Tellas's statements were hearsay that did not qualify for admission under Michigan's former-testimony or catch-all exceptions, and that their admission violated his Sixth Amendment right to confront the witnesses against him.  *See* Opening Brief in Support of Petition for Writ of Habeas Corpus filed August 31, 2005 ("Pet") at 1-2.

Next, Wilkey contended that trial counsel rendered constitutionally ineffective assistance in three ways:  failing to object to the prosecutor vouching for the truthfulness of a co-defendant's testimony, *see* Pet at 3-5; failing to object or move for a mistrial when the co-defendant testified that Wilkey had helped him perpetrate other, unrelated "home invasions", *see* Pet at 3-5; and bringing to the jury's attention the fact that Wilkey had a prior conviction for being a felon in possession of a firearm, *see* Pet at 6-8 and 18 U.S.C. § 922(g)(1).

The Michigan Court of Appeals rejected Wilkey's arguments and affirmed his conviction,

*State v. Wilkey*, 2004 WL 576659 (Mich. App. Mar. 23, 2004) (p.c.) (P.J. Murray, Murphy, Markey),
*recon. denied w/o op.* (Mich. App. May 24, 2004), and the Michigan Supreme Court denied review,
691 N.W.2d 454, 2005 WL 273891 (Mich. Jan. 13, 2005) (table).

## AEDPA Standard

Under AEDPA, a federal court can grant Wilkey's petition only if he shows that the state
courts' decision (1) was contrary to, or involved an unreasonable application of, clearly established
federal law as determined by United States Supreme Court precedent, or (2) was based on an
unreasonable determination of the facts in light of the evidence. *See Colwell v. McKee*, 2009 WL
125223, *2 (W.D. Mich. Jan. 16, 2009) (Maloney, C.J.) (citing 28 U.S.C. § 2254(d)). Only the
*holdings* of the Supreme Court constitute clearly-established federal law for this purpose, not *dicta*.
*See Fields v. Quigley*, 2008 WL 4562211, *4 (W.D. Mich. Oct. 8, 2008) (Maloney, C.J.) (citing
*Williams v. Taylor*, 529 U.S. 362, 412 (2000), and *Ross v. Petro*, 515 F.3d 653, 660 (6th Cir. 2008),
*reh'g & reh'g en banc denied* (6th Cir. July 17, 2008), *cert. denied sub nom. Ross v. Rogers*, – U.S.
–, 129 S.Ct. 906 (2009)).[1]

A federal court cannot find a state court's ruling to be "unreasonable" merely because it
concludes, in its independent judgment, that the state court applied clearly-established federal law
erroneously. *See Thompson v. Bell*, Nos. 06-5744 & 06-5770, – F.3d –, –, 2009 WL 2901193, *6
(6th Cir. Sept. 11, 2009); *Beeman v. Berghuis*, 2008 WL 4820500, *3 (W.D. Mich. Oct. 30, 2008)

---

[1] The federal habeas court may look to U.S. Court of Appeals decisions, but only to inform
its determination of whether a legal principle is considered to be "clearly established" by a Supreme
Court decision. *See Ruelas v. Wolfenbarger*, – F.3d –, – , 2009 WL 2851374, *4 (6th Cir. Sept. 8,
2009) (<u>Martin</u>, Kethledge, S.D. Ohio D.J. Michael Watson) (citing *Hereford v. Warren*, 536 F.3d
523, 528 (6th Cir. 2008) (citing *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003))).

(Maloney, C.J.) (citing *Williams*, 529 U.S. at 412, and *Bell v. Cone*, 535 U.S. 685, 699 (2002)).

Rather, the federal habeas petitioner must show that the state court's interpretation or application of U.S. Supreme Court holdings was objectively unreasonable. *Lockyer v. Andrade*, 538 U.S. 63 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 411 (2000)). For this purpose, "'objectively unreasonable' . . . means 'something like lying well outside the boundaries of permissible differences of opinion . . . .'" *Allen v. Chandler*, 555 F.3d 596, 602 (7th Cir. 2009) (Coffey, J.) (quoting *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003)).

To show that the state court's interpretation or application of Supreme Court holdings was objectively unreasonable, a habeas petitioner must show that the state court applied an incorrect legal rule, reached a different result from the United States Supreme Court on materially indistinguishable facts, identifies the correct legal rule but applies it unreasonably to the facts of the case, unreasonably extends a principle from Supreme Court precedent to a context where it should not apply, or unreasonably *refuses* to extend a principle from Supreme Court precedent to a context where it logically *should* apply. *See Leatherman v. Palmer*, 583 F. Supp.2d 849, 862 (6th Cir. 2008) (Maloney, C.J.) (citing *Williams*, 529 U.S. at 407, and *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003), and *Bailey v. Mitchell*, 271 F.3d 652, 655-56 (6th Cir. 2001)).

For the state court's ruling to be "reasonable", the state court decision need not cite Supreme Court precedent on point, or even reflect awareness of such cases, "'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Coomer v. Yukins*, 533 F.3d 477, 484 (6th Cir. 2008) (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)), *cert. denied*, – U.S. –, 129 S.Ct. 1349 (2009); *Dennis v. Mitchell*, 354 F.3d 511, 517-18 (6th Cir. 2003) (quoting *Early*). *Accord Revels v. Sanders*, 519 F.3d 734, 739 (8th Cir.), *cert. denied sub nom. Attebury v. Revels*, – U.S. –, 129 S.Ct.

598 (2008).

The R&R does yeoman's work grappling with a difficult issue. This court agrees with the Magistrate Judge that the violation of Wilkey's Confrontation Clause rights was harmless error under the circumstances. This court also agrees that, while Wilkey's trial counsel's performance was less than optimal in two respects, Wilkey cannot show the requisite prejudice in light of the very strong evidence against him from a variety of sources (other than the late victim, Mrs. Tellas). Therefore, largely for the reasons stated by the R&R, the court concludes that Wilkey has not met the AEDPA standard and is not entitled to a writ of habeas corpus.


**DISCUSSION:  Mrs. Tellas's Deposition Testimony**

1.      Old and New Standards for Sixth Amendment Confrontation Clause

Preliminarily, the court notes that habeas review is conducted "'in light of the law as it existed at the time of the final state-court decision'", *Hawkins v. Ganshimer*, 286 F. App'x 896, 901 (6th Cir. 2008) (Guy, Suhrheinrich, Gibbons) (quoting *Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 1994)).  It makes no difference whether one considers "the final state-court decision" to be the Michigan Court of Appeals' denial of Wilkey's motion to reconsider its affirmance of his conviction in May 2004 or the Michigan Supreme Court's denial of Wilkey's application for discretionary review in January 2005.  As discussed below, the Supreme Court decision that fundamentally altered the interpretation of the Sixth Amendment's Confrontation Clause – in a way that tends to benefit Wilkey – was issued in March 2004.

The R&R correctly notes that in determining whether the admission of Mrs. Tellas's deposition testimony violated Wilkey's Sixth Amendment Confrontation Clause right, the Michigan

Court of Appeals applied *Ohio v. Roberts*, 448 U.S. 56 (1980), even though the Supreme Court announced a new standard before the Michigan Court of Appeals' decision, in *Crawford v. Washington*, 541 U.S. 36 (2004). *Accord Bobadilla v. Carlson*, 575 F.3d 785, 788 (8th Cir. 2009) (noting, in AEDPA habeas case, "*At the time of Bobadilla's trial*, the admission of such evidence was governed by the standard set forth in *Ohio v. Roberts* . . . .") (emphasis added).

Under the old *Ohio v. Roberts* standard, the Confrontation Clause barred admission of an out-of-court testimonial statement unless (1) the declarant was unavailable and (2) the statement bore "adequate indicia of reliability." *Shaw v. Harry*, 2008 WL 4534156, *20 (W.D. Mich. Sept. 29, 2008) (Maloney, C.J.) (quoting *Roberts*, 448 U.S. at 66). If the statement fell within a firmly rooted hearsay exception, the statement was conclusively presumed to be reliable; if the statement did not fall within such an exception, the statement was excluded unless the proponent showed a "particularized guarantee of trustworthiness." *Id.*

By the time of the Michigan Court of Appeals' decision, however, the U.S. Supreme Court had issued *Crawford*, where the Supreme Court abrogated *Roberts*' second prong with respect to testimonial statements. *See Shaw*, 2008 WL 4534156 at *20. Thus, the Michigan Court of Appeals should have applied the new *Crawford* standard. Under *Crawford*, the Confrontation Clause bars a testimonial out-of-court statement unless the defendant had a prior opportunity to cross-examine the declarant; it does not matter whether the statement might be deemed "reliable." *Shaw*, 2008 WL 4534156 at *20 (citing *Crawford*, 541 U.S. 36).[2]

---

[2]
Since *Crawford*, the Supreme Court has broadly construed which type of statements are considered testimonial and therefore subject to the defendants' constitutional right to confront the speaker or writer. *See Melendez-Diaz v. Massachusetts*, – U.S. –, 129 S.Ct. 2527 (2009) (Scalia, J.) (in prosecution for distributing and trafficking in cocaine, state trial court violated Confrontation Clause by admitting state laboratory certificates regarding drugs without requiring scientists to

Conversely, a *non*-testimonial statement is no longer subject to Confrontation Clause scrutiny at all. *See Doan v. Carter*, 548 F.3d 449, 458 (6th Cir. 2008) (citing *Giles v. California*, – U.S. –, –, 128 S.Ct. 2678, 2393-94 (2008) and *Crawford*, 541 U.S. at 51); *see, e.g., US v. Johnson*, No. 08-1662, – F.3d –, –, 2009 WL 2972353, *3 (6th Cir. Sept. 18, 2009) ("Because O'Reilly did not know that his statements were being recorded and because it is clear that he did not anticipate them being used in a criminal proceeding against Johnson, *they are not testimonial, and the Confrontation Clause does not apply*.") (emphasis added).

2.      The Admission of Mrs. Tellas's Testimony Violated Wilkey's Confrontation Rights

The Magistrate Judge correctly determined that Ms. Gallas's deposition testimony was testimonial within the meaning of the Supreme Court's precedents, because she "intend[ed] to bear testimony" against Wilkey, i.e., "a reasonable person in [her] position would anticipate h[er] statement being used against the accused in investigating and prosecuting the crime." *US v. Johnson*, No. 08-1662, – F.3d –, –, 2009 WL 2972353, *3 (6th Cir. Sept. 18, 2009) (citing *US v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004)). Therefore, the admission of Ms. Tellas's deposition testimony implicates Wilkey's rights under the Sixth Amendment Confrontation Clause.

It is undisputed that Ms. Gallas died after her deposition and before Wilkey's trial, so the first of *Crawford*'s two prongs for admission of the testimony is satisfied (unavailability of the declarant).

Under *Crawford*'s second prong, the Michigan trial court should not have admitted Ms.

_____

testify in court and be subject to cross-examination, and it was immaterial that analysts were arguably not "accusatory" or "conventional" witnesses, that their testimony regarded neutral scientific testing, or that the certificates were akin to business or official records, or that the defendant had the ability to subpoena the scientists).

Tellas's deposition testimony unless Wilkey had an opportunity to cross-examine her. It is undisputed that Wilkey himself did not have an opportunity to cross-examine Ms. Tellas. But in connection with Ms. Tellas's deposition, the Michigan trial court appointed an attorney to represent the interest of any defendant subsequently charged in the case (Wilkey had not been charged at the time of the deposition). That court-appointed defense attorney in fact cross-examined Ms. Tellas.

Because the parties' briefs did not cite any decision on all fours with this situation, the Magistrate Judge diligently researched federal case law nationally and found *Burger v. Oklahoma*, 238 F. App'x 343 (10th Cir. 2007).[3] There, the defendant argued that he did not have a proper opportunity to cross-examine the declarant at his deposition, since the defendant changed counsel between deposition and trial and his trial counsel did not have the chance to cross-examine the declarant. A Tenth Circuit panel held that the admission of the deposition testimony without cross-examination by defendant's trial counsel did not violate the Confrontation Clause, because the Clause provides only the opportunity for effective cross-examination, "not cross-examination that is effective in whatever way, and whatever extent, the defense might wish." *Burger*, 238 F. App'x at 347 (citing *Kentucky v. Stincer*, 482 U.S. 739, 739 (1987) (Blackmun, J.)). *See also US v. Owens*, 484 U.S. 554, 559 (1988) (Scalia, J.) (quoting *Stincer* and citing, *inter alia*, *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (citing *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (p.c.))); *US v. Hunt*, 521 F.3d 636, 644 (6th Cir. 2008) (Rogers, J.) (quoting *Fensterer*, 474 U.S. at 20), *cert. denied*, – U.S. –, 129 S.Ct. 2157 (2009).[4]

_____

[3]No federal or state-court decisions available on WestLaw have cited *Barger*.

[4]
*See, e.g., Gonzales v. Wolfe*, 290 F. App'x 799, 808-809 (6th Cir. 2008) (Moore, <u>Clay</u>, N.D. Cal. D.J. Wm. Schwarzer) (affirming denial of § 2254 habeas petition) (quoting *Fensterer* for this same proposition, and holding that "[t]hus, a trial court's limitation on cross-examination regarding

In our case, the Magistrate Judge reasoned that, "Here, because counsel was appointed to represent the as-yet uncharged defendant, Petitioner, through appointed counsel, arguably was provided a sufficient opportunity to cross-examine Mrs. Tellas as required by *Crawford*." R&R at 17. This court respectfully disagrees with the Magistrate Judge's suggested resolution of this issue, an issue on which there is no binding precedent, and little persuasive authority, to guide us. The Confrontation Clause guarantees *the criminal defendant* an opportunity to cross-examine the declarant of a testimonial hearsay statement. Neither *Crawford* (nor any U.S. Supreme Court or Sixth Circuit Court of Appeals decisions interpreting *Crawford*) has held that the Confrontation Clause is satisfied so long as *someone* had an opportunity to cross-examine the declarant.

No matter how diligent the cross-examination of Mrs. Tellas by the court-appointed attorney, that attorney did not specifically represent Wilkey. For one thing, an attorney who specifically represented Wilkey, would have had an undivided duty of loyalty to Wilkey alone as his client. Moreover, an attorney who specifically represented Wilkey would have extensively discussed the case with Wilkey from his perspective, so he might well have asked different or additional questions of Mrs. Tellas (or asked some of the same questions in a different sequence, with a different emphasis, or with a different tone of voice).

It was appropriate for the Magistrate Judge to consult *Burger* and consider whether it might shed light on how to proceed, but *Burger* is readily distinguished from our case. The defendant in *Burger* was already charged in the case, and was represented by his own counsel, at the time of the

---

a witness's bias violates the Confrontation Clause [only] when '[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had . . . counsel been permitted to pursue his proposed line of cross-examination"), *cert. denied*, – U.S. –, 129 S.Ct. 1016 (2009).

declarant's deposition. Therefore, an attorney specifically representing Burger had an opportunity to cross-examine the declarant. The Tenth Circuit logically concluded that this satisfied the Confrontation Clause, notwithstanding the fact that Burger changed counsel sometime after the deposition and before trial. Here, by contrast, no attorney specifically representing Wilkey ever had the opportunity to cross-examine Mrs. Tellas.

And it is not for the court to speculate and *assume* that cross-examination by someone other than Wilkey's own counsel was materially identical to what Wilkey's own counsel would have asked, or that such cross-examination was "good enough." If Wilkey's own counsel had cross-examined Mrs. Tellas, Wilkey could have assisted counsel in developing questions and tactics. A recent Sixth Circuit decision emphatically describes the importance of allowing the defendant himself to be present at cross-examination, both to "confront" the witness and to aid his counsel in that examination. The Sixth Circuit panel wrote,

> In addition to the value of forcing a witness to testify face-to-face with the accused, another "primary interest secured by [the Confrontation Clause] is the right of cross-examination," *Douglas v. Alabama*, 380 U.S. 415, 418 . . . (1965), which "is critical for ensuring the integrity of the fact-finding process," *Kentucky v. Stincer*, 482 U.S. 730, 736 . . . (1987). By "integrity," we do not merely mean the perception of a fair trial, but also the tactical assistance [defendant] could have offered his attorney while he questioned [the witness] about her testimony.
>
> Although [defendant] had the opportunity to consult with his attorney after the court removed him from the courtroom and before the start of [the witness's] cross-examination, [defendant] was not present during the actual cross-examination and therefore could not assist his attorney in following up to any answers [the witness] provided on cross-examination. *Allen*, 397 U.S. at 344 . . . (noting that "one of the defendant's primary advantages to being present . . . [is] his ability to communicate with his counsel"). * * * Thus, we cannot say that [defendant] had "a full and fair opportunity to probe and expose [the witness's] infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to [her] testimony." *Delaware v. Fensterer*, 474 U.S. 15, 22 . . . (1985).

*Gray v. Moore*, 520 F.3d 616, 627 (6th Cir.) (emphasis added) (paragraph break added), *cert. denied*,

– U.S. –, 129 S.Ct. 216 (2008).

This court will not depart from the words of the Supreme Court and allow cross-examination by *others* to substitute for what is a personal, individual right that belongs to the defendant and nobody else. The government should be required to comply strictly, not "substantially" or partially, with Constitutional provisions that safeguard individual rights against the overwhelming coercive power of the State – particularly when the individual's physical liberty itself is threatened by imprisonment. Just as the Supreme Court hewed strictly and literally to the words of the Confrontation Clause,[5] this court hews strictly to the words of *Crawford*. An opportunity for the defendant to cross-examine the declarant must mean just that: an opportunity for *that defendant* to cross-examine the declarant, and nothing less. *See Hamilton v. Morgan*, 474 F.3d 854, 858 (6th Cir.) (Siler, J., joined by Batchelder, J., with Moore, J., dissenting o.g.) ("The unavailability exception contains two requirements. First, the exception mandates that the witness's testimony was given at previous judicial proceedings *against the same defendant* which was subject to cross-examination *by that same defendant*.") (emphasis added) (citing *Crawford*, 541 U.S. at 54), *reh'g & reh'g en banc denied* (6th Cir.), *cert. denied*, – U.S. –, 128 S.Ct. 380 (2007).

Accordingly, the court cannot adopt the R&R's suggestion that the state trial court did not violate Wilkey's Confrontation Clause rights.

---

[5]

*See US v. Gonzales-Lopez*, 548 U.S. 140 (2006) (Scalia, J.), where the Supreme Court cautioned against "a line of reasoning that 'abstracts from the right to its purposes, and then eliminates the right.'" *Id.* at 145 (quoting *Maryland v. Craig*, 497 U.S. 836, 862 (1990)). The Court noted that in *Crawford*, it had rejected the argument that "[s]ince . . . the purpose of the Confrontation Clause was to ensure the reliability of evidence, so long as the testimonial hearsay bore 'indicia of reliability,' the Confrontation Clause was not violated." *Gonzales-Lopez*, 548 U.S. at 146. The Court emphasized *Crawford*'s holding "that the Confrontation Clause 'commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Gonzales-Lopez*, 548 U.S. at 146.

3.    The Confrontation Clause Violation was Harmless Error under the Circumstances

**The court agrees with the R&R, however, that any Confrontation Clause violation caused by admitting Mrs. Tellas's deposition testimony was harmless under the circumstances.**

It is true that Confrontation Clause violations are subject to harmless-error analysis. *See Mayle v. Felix*, 545 U.S. 644, 673 n.6 (2005) (Souter, J., dissenting on other grounds, joined by Stevens, J.) ("The erroneous admission of evidence in violation of the . . . right to confront witnesses guaranteed by the Sixth Amendment are both subject to harmless-error analysis under our cases.'") (quoting *Neder v. US*, 527 U.S. 1, 18 (1999)). *See also US v. Buffington*, 2009 WL 367582, *4, – F. App'x –, – (6th Cir. Feb. 9, 2009) ("'Confrontation Clause violations are subject to harmless error review.'") (quoting *Jordan v. Hurley*, 397 F.3d 360, 363 (6th Cir. 2004)).

When determining whether an error was harmless, there are different standards on collateral review (such as a habeas corpus petition) and direct review (direct appeal). *Peterson v. Warren*, – F. App'x –, –, 2009 WL 383730, *5-6 (6th Cir. Feb. 17, 2009) (Merritt, Rogers, White) (citing *Wilson v. Mitchell*, 498 F.3d 491, 502 (6th Cir. 2007)). The harmless-error standard is "'stricter (i.e., tougher on the petitioner)'" on collateral review than on direct review. *Peterson*, – F. App'x at – n.3, 2009 WL 383730, *6 n.3 (quoting *Wilson*, 498 F.3d at 503). On direct review, this court would ask whether the error was harmless "beyond a reasonable doubt." *Peterson*, – F. App'x at – , 2009 WL 383730 at *5-6 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

On collateral review, however, this court asks only whether the error had "substantial and injurious effect or influence in determining the jury's verdict." *Peterson*, – F. App'x at –, 2009 WL 383730 at *6 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. US*, 328 U.S. 750, 776 (1946))). The court considers both the impact of the improperly admitted

evidence and the overall weight of the evidence presented at trial. *Peterson*, – F. App'x at –, 2009 WL 383730 at *7 (citing *Brecht*, 507 U.S. at 639).

Supreme Court decisions make clear that the federal court should not lightly conclude that a trial error was harmless. As the R&R notes, the Supreme Court held in 1995 that the error is harmless if it "did not influence the jury, or had but very slight effect." R&R at 28 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437-38 (1995) and citing *Kotteakos v. US*, 328 U.S. 6750, 765 (1946)). But the Supreme Court also held, that same year, that "[t]o determine the effect of an error, the question to be answered is 'whether the guilty verdict actually rendered in this trial was *surely* unattributable to that error.'" *Doan v. Carter*, 548 F.3d 449, 459 (6th Cir. 2008) (Siler, McKeague, Ludington, D.J.) (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1995) (Scalia, J., for a unanimous Court, with Rehnquist, C.J., concurring separately)) (emphasis added). Our Circuit may consider a guilty verdict "surely unattributable" to the error, for example, when the erroneously admitted testimony or evidence was wholly "cumulative of other evidence admitted . . . ." *Doan*, 548 F.3d at 459.

Whenever the court is "in 'grave doubt as to whether the error had such an effect, 'that error is not harmless.'" *Gray v. Moore*, 520 F.3d 616, 625 (6th Cir. 2008) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)); *see also Stewart v. Erwin*, 503 F.3d 488, 501 (6th Cir. 2007) ("'[W]hen a habeas court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief.'") (quoting *O'Neal*, 513 U.S. at 445). The Supreme Court has clarified that "by 'grave doubt' we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.'" *O'Neal*, 513 U.S. at 435. Correspondingly, Wilkey need not show that the error was outcome-determinative; rather, precedent

"plac[es] the risk of doubt on the State.'" *Moore*, 520 F.3d at 625-26 (quoting *O'Neal*, 513 U.S. at

439); *see also Forensic v. Birkett*, 501 F.3d 469, 481 (6th Cir. 2007) (citing *O'Neal* for the

proposition that "petitioners do not bear an affirmative burden of proof" and that "uncertainty in

answering this question [whether an error was harmless] . . . militates in favor of the habeas

petitioner"). In other words, a "tie" or "near-tie" on the harmlessness determination goes to the

habeas petitioner.[6]

      The harmless-error "is highly fact-specific, and it requires us to describe the State's case

against [defendant] in some detail." *McCray v. Metrish*, 232 F. App'x 469, 472 (6th Cir. 2007). The

R&R cogently reasoned that the admission of Mrs. Tellas's un-cross-examined testimony was not

so prejudicial to Wilkey as to require *vacatur* because

> Mrs. Tellas gave only a vague, general description of the assailant, was unable to see
> his face because of his mask, and had very poor eyesight on that night, both because
> it was dark and because she was not wearing her glasses. That conclusion was
> patently reasonable. In fact, Mrs. Tellas' testimony was even more strikingly
> unhelpful to the prosecution than described by the [Michigan] [C]ourt of [A]ppeals.
> Mrs. Tellas testified that she could not see or describe the assailant because he was
> wearing a mask and her vision was poor. (Tellas Dep., 26) On cross-examination [by
> someone who was not representing Wilkey and did not have communication with
> Wilkey] Mrs. Tellas could not even testify whether or not the perpetrator was
> Caucasian, an identification she earlier made by voice alone. (*Id.*, 65.)
>
> She described the perpetrator as being thin and about the same height as her husband,
> 5'8", or a little more. (*Id.*, 61.) But subsequent testimony revealed that Petitioner
> was 6'1" and that Brockless better fit the description given by Mrs. Tellas in her
> deposition. (Tr. III, 18.) Tellas'[s] testimony therefore helped Petitioner with his
> defense strategy to implicate Brockless [who had been arrested and charged with

<hr/>

[6]

      *See, e.g., Stallings v. Bobby*, 464 F.3d 576, 583 (6th Cir. 2006) (where jury might or might
not have accepted inadmissible-hearsay testimony and relied on it to convict, the defendant was
entitled to habeas relief; "We find that the matter is at least evenly balanced and, as a result, that we
are left with grave doubt as to the harmlessness of the error in admitting the statement. It therefore
follows . . . that we are required to treat the error . . . as if it affected the verdict.") (internal citations
and quotation marks omitted).

first-degree murder for the killing of Mr. Tellas and later accepted a plea offer.).

> The testimony also undermined Detective Sergeant Averill's testimony at trial concerning Mrs. Tellas'[s] statement at the hospital on the night of the murder. According to Averill, Mrs. Tellas told him that the assailant was 5'0" to 6' tall. (Tr. II, 50.) Mrs. Tellas'[s] deposition testimony, therefore, assisted Petitioner by undercutting the more damaging description provided by Averill. Further, defense counsel used the height estimate given in the deposition as his first point in closing argument, suggesting that, because most people could tell the difference between someone over six feet tall and someone under six feet tall, Mrs. Tellas's testimony helped to raise reasonable doubt about whether the perpetrator was Petitioner. (Tr. III, 91.) * * * Even if the jury found Mrs. Tellas'[s] description credible or helpful, that description worked in Petitioner's favor. No part of Mrs. Tellas'[s] testimony could have had a "substantial and injurious effect on the result." *Brecht*, 507 U.S. at 638. The admission of Mrs. Tellas'[s] testimony, therefore, was harmless.

R&R at 18-19 (paragraph break added).

The R&R thoroughly and correctly identifies the ways in which Mrs. Tellas's testimony could have helped Wilkey. Perhaps the R&R could have focused more on the ways in which her testimony theoretically could have made the jury more likely to find that Wilkey was the murderer, but that does not warrant rejection of the R&R's sound reasoning.

First, while Tellas's estimate of the murderer's height (about 5'8") better described government witness Richard Brockless, her description of the murderer's build far better fit Wilkey's physical appearance than Brockless's. Mrs. Tellas described the murderer as being "thin" and having "a slim build." Wilkey reasons that the jury might have concluded that the slim, thin intruder was Wilkey, who was 6'1" but weighed only 155 pounds at the time of the murder, rather than Brockless, who was 5'10" and weighed about 180 pounds at that time. But the fact remains that Brockless (5'10"), not Wilkey (6'1"), *much* better fit Tellas's description of the intruder as being only 5'8" tall.

The jury heard other potentially inculpatory testimony from Mrs. Tellas regarding the killer's

appearance. She testified that the intruder was dressed completely in dark clothing and had a dark ski mask over his face, and she "believed [he] was a white male." This testimony would not serve as reliable corroboration of Detective Averill's testimony that the killer was a white man wearing a mask and dark clothing, however, because Mrs. Tellas also admitted that ultimately she could not confidently tell the race or color of the intruder. It is also significant that in closing arguments to the jury, Wilkey's counsel stressed that Mrs. Tellas had been unable to identify Wilkey in a photographic line-up. *See* Cross-Examination of Michigan State Police Detective Dana Averill - Trial Transcript Vol. II (Wed. Oct. 2, 2002) at 69:10 to 70:1.

It is true that the jury reasonably could have taken Mrs. Tellas's testimony to bolster and corroborate the testimony of other witnesses tending to inculpate Wilkey. For example, she testified that she and her husband were watching television in their living room, corroborating (1) Daniel Blade's testimony that Wilkey told him that "they had observed the gentleman [Mr. Tellas] and his wife watching TV in the house and (2) David Mitchell's testimony that Wilkey told him that he had seen "an elderly couple sitting in the living room watching TV." *See* Tr. II at 115-16 and 168.

Mrs. Tellas also testified that she and Mr. Tellas heard a loud noise coming from the vicinity of the back door, which was consistent with Brockless's testimony that he saw Wilkey at the back door (back porch) of their home on the night of the murder, and Mitchell's testimony that Wilkey said "he went around to the back door . . . ." *See* Tr. II at 115-16.

Mrs. Tellas's testimony about the killer's weapon also arguably supported the inference that Wilkey was the killer. She testified that the killer's gun did not resemble a shotgun or a handgun; rather, she recalled the firearm being longer than a handgun, maybe a "sawed-off" long-arm. This testimony was consistent with (1) Councilor's testimony that he saw Wilkey carrying a sawed-off

firearm around the date of the murder, (2) Anita Gray's testimony that Wescott loaned a modified or "broken-down barrel" rifle to Wilkey and Brockless, (3) the testimony of both Chris Brady and his wife Carla Brady that he and Wilkey visited Councilor a few days before the murder and showed him a sawed-off rifle, (4) Brockless's testimony that when he and Daniel Blade and Wilkey walked to the victims' home together, Wilkey was carrying a sawed-off rifle, and (5) Blade's testimony that Wilkey told him he had shot an elderly man in the head with a sawed-off rifle. But on none of these points did Mrs. Tellas's testimony provide the jury with an allegation, theory or issue on which it did not already have other competent evidence. Rather, Mrs. Tellas's testimony about the firearm was merely cumulative of the testimony of Councilor, Anita Gray, Chris Brady, Carla Brady, Brockless, and Blade that they saw Wilkey with a sawed-off rifle, or heard him say that he had one. More generally, a neighbor of the Tellas's, Mr. Monacelli, also reported seeing a white person with a rifle standing in his side yard around the time of the murder, though the neighbor did not mentioned the sawed-off aspect. *See State v. Wilkey*, 2004 WL 576659, *2 (Mich. App. Mar. 23, 2004) (p.c.) (P.J. Murray, Murphy, Markey).

Mrs. Tellas also testified at deposition that someone had cut a telephone wire, because she was unable to use one of the telephones in the house to call for help, but they had missed another wire, enabling her to use a different telephone. But Mrs. Tellas's testimony on this score was merely cumulative of Sheryl Hough's testimony that Wilkey had complained about "the stupid asses cutting the wrong wire", as well as Brockless's testimony that Wilkey or an accomplice had "cut a phone line." Mrs. Tellas's testimony about the phone wires was also partially duplicative of State Police Detective Jeff Wallis's direct-examination testimony that "I do distinctly remember the router telephone or television antenna router wire was cut on the north side of the house and a telephone

wire was cut on the east side of the house."  *See* Trial Transcript Vol. II (Wed. Oct 2, 2002) at 87:1 to 88:18, with quoted passage at 87:17 through 20.

In all, *at least five witnesses testified that Wilkey essentially directly confessed to them* (cellmate David Mitchell, social acquaintance Daniel Blade, Richard Brockless, personal acquaintance Sheryl Hough, and ex-girlfriend Christy Czarnowski).  For example, Czarnowski testified that although Wilkey initially denied rumors that he was involved in the murder, he later remarked to her on more than one occasion that she "did not know what it was like to have killed a man, and that he and Brockless had committed a breaking and entering together."  *People of the State of Michigan v. Wilkey*, 2005 WL 576659, *4 (Mich. App. Mar. 23, 2004).  Czarnowski further testified that in 1995, she opened the mail at the Grand Rapids home she shared with Wilkey and found a Polaroid picture of an elderly man with this written underneath:  "I remember you, do you remember me?" or "I remember you, fucker."  *Id.*  Czarnowski testified that when she confronted Wilkey with the photo and statement, he assured her there was no reason to worry but "turned a sickly, green, pale color . . . ."  *Id.*

At least four additional witnesses testified that they saw Wilkey with the type of firearm used in the murder around the relevant time, heard him say that he had such a weapon, or heard that he had been loaned such a weapon:  Councilor, who was a personal associate of Wilkey's; Anita Gray, a resident of the neighborhood where the crimes took place; and Chris Brady and his wife Carla Brady, also residents of that neighborhood, who knew Wilkey, Councillor, and Brockless.  *See People v. Wilkey*, 2005 WL 576659, *5-6 (Mich. App. Mar. 23, 2004).

In addition, a State Police Detective, Sergeant Dana Averill, testified that Wilkey initially claimed that he had left Councillor's house at about 11:30 p.m. on the night of the murder.  *Id.* at

-18-

*5. Detective Averill further testified that when he interviewed Councillor's mother, who was at the Councillor home that night, she said that Wilkey had left for a period of time and then returned. Detective Averill testified that when he confronted Wilkey with this information, Wilkey changed his story, saying "oh yeah, that's right" and claiming that he now remembered leaving Councillor's house at 10:00 p.m. to get something to eat at his own house and then returning to Councillor's house. *Id. See* Detective Averill's testimony on Direct Examination - Transcript of Trial, Vol. II (Wed. October 2, 2002), 56:11 to 60:12. A reasonable jury was clearly entitled to infer that Wilkey lied to the police about when he left Councillor's house because he was trying to cover up the fact that he left Councillor's house at 10:00 p.m. and committed the home invasion and murder of Mr. Tellas before returning.

Finally, the jury also heard testimony suggesting that Wilkey lied to the police about the cause of his ankle sprain. Wilkey's cousin testified that around the date of the murder, Wilkey visited him and was wearing a leg brace because of a sprained ankle. Wilkey told him that he had sustained the injury by slipping and falling on ice. *People v. Wilkey*, 2005 WL 576659 at *4. But another State Police Detective, Sergeant Jeff Wallis, testified that Wilkey told him that he had injured his ankle during horseplay at Councillor's home. *Id.* at *6. Detective Wallis further testified that he had photographed a ditch near the Tellas's home which was full of frozen water when police responded to the scene: "it appeared that someone had stepped onto the frozen water and broken through the ice" and significantly, the "ditch was in the same general area over which the police dog had tracked a scent." *Id.* Councillor testified that when Wilkey left Councillor's home, he had no ankle or leg injury and was walking normally. *Id.* at *3 and *7. The jury was clearly entitled to infer that Wilkey actually injured his ankle by slipping on that ice patch while fleeing from the crime

scene, and therefore, that he was involved in the crimes.

In other words, even without Mrs. Tellas's deposition testimony, the evidence against Wilkey was not only strong but overwhelming.[7]

Finally, the court considers whether Mrs. Tellas's testimony might have been especially helpful to the prosecution given the lack of forensic or ballistic evidence tying Wilkey to the home invasion or the murder, as was the case in *Fulcher v. Motley*, 444 F.3d 791 (6th Cir. 2006). The court concludes, however, that *Fulcher* is readily distinguishable from our case, and that the jury had more

---

[7]

*Contrast Hargrave v. McKee*, 248 F. App'x 718 (6th Cir. 2007):

To be clear, we do not suggest that Hargrave was constitutionally entitled to cross-examine Warner in whatever manner he wishes regarding any and all recorded incidents, delusions, or psychiatric evidence. * * * We conclude, however, that the state trial court's decision limiting Hargrave solely to the question of whether Warner had been diagnosed as a paranoid schizophrenic was an unreasonable application of Supreme Court precedent and violated Hargrave's rights under the Confrontation Clause.

* * *

Warner's testimony was integral to the prosecution's case, as she was the only eyewitnesses to the alleged crimes and was the only witness who could provide any testimony regarding two necessary elements of the crime of carjacking: whether Hargrave's taking of her was a "larceny"; and whether he used "force or violence", "the threat of force or violence", or "put [Warner] in fear," . . . .

The broken window provided circumstantial corroborating evidence that force was used to take the car, but only Warner's testimony indicated that Hargrave was responsible for breaking the window, and Hargrave's own statement contradicted Warner's. Aside from Warner's testimony, the prosecution's case was based on second-hand accounts and scattered pieces of circumstantial evidence. * * * In sum, the factors listed in *Van Arsdall* point strongly towards our conclusion that the state trial court's decision limiting cross-examination had a substantial and injurious effect on the jury's verdict. Accordingly, Hargrave is entitled to habeas relief.

*Id.* at 728 and 728-29 (footnote 3 omitted) (last paragraph break added).

than enough evidence to find Wilkey guilty beyond a reasonable doubt without Mrs. Tellas's testimony *or* ballistic or forensic evidence, and in fact reached that verdict without relying on her testimony.

*Fulcher* was another home-invasion case where a prisoner sought habeas relief following his convictions for murder, burglary and robbery. *Fulcher*, 444 F.3d at 794. The woman who was both Fulcher's accomplice and his girlfriend at the time of the murder, Ash, gave statements in a police-station interview that tended to inculpate him. *Id.* Before trial, Ash married Fulcher; at trial, she invoked the marital privilege and thereby became "unavailable" for purposes of the hearsay rule. *Id.* Fulcher contended that the state trial court violated his Sixth Amendment Confrontation Clause rights by admitting Ash's statements. *Id.* at 797. The Sixth Circuit agreed, holding that "accomplices' statements that inculpate a defendant" were not admissible under the hearsay exception for statements against penal interest (or any other hearsay exception) under clearly established federal law at the time of the trial. *Id.* at 800-807. Accordingly, the Circuit held that the state trial court erred in admitting Ash's statements to the police. *Fulcher*, 444 F.3d at 808.

The Circuit then held that the error in admitting Ash's statement against Fulcher was not harmless. The Circuit placed great weight on the fact that Ash's statements could have prejudiced Fulcher more in the eyes of the jury because of the lack of "hard" physical evidence tending to show that he was the murderer. *Fulcher*, 444 F.3d at 808-09. On behalf of the panel majority,[8] Judge

---

[8]

U.S. District Judge Solomon Oliver (D.D.C.) joined Judge Cook's opinion, and Judge Clay wrote an opinion concurring in the holding that admission of Ash's hearsay statement violated the Confrontation Clause and was not harmless error. *See Fulcher*, 444 F.3d at 811-30. Judge Clay wrote separately because he "believe[d] that *Crawford v. Washington*, 541 U.S. 36 . . . (2004), establishes a watershed rule of criminal procedure requiring retroactive application under the Supreme Court's retroactivity analysis in *Teague v. Lane* . . . ." *Fulcher*, 444 F.3d at 811. This disagreement is not relevant to our case, because the U.S. Supreme Court issued *Crawford* before

Cook wrote as follows:

> Fulcher notes that the prosecution's case was "entirely circumstantial" and that no physical evidence linked Fulcher to the crime scene or the crime: no fingerprints, no clothing stained with the victim's blood, no traces of the victim's blood in Fulcher's car, and no murder weapon. * * *

> [W]e must consider the likelihood that Ash's statements *bolstered* [accomplice] Wright's account in the jury's eyes. *Without Ash's account* of washing the blood off of Fulcher's sweatpants, *nothing would have physically connected Fulcher to the crime.* * * *

> * * *

> Viewing the totality of the evidence, we cannot reject the possibility that the admission of Ash's statements had "a substantial and injurious effect or influence in determining the jury's verdict," and we have "grave doubt" that they did not. *Brecht*, 507 U.S. at 623 . . . . *Ash's statements* bolstered the only direct account of Fulcher's involvement in the crime and *connected him to the only physical (albeit circumstantial) evidence in the government's case.* * * *

*Fulcher*, 444 F.3d at 809, 811 (emphasis added). Unlike *Fulcher*, however, the erroneously admitted testimony here did not provide "the only direct account" of the defendant's involvement in the crime. Numerous witnesses tied Wilkey directly to the crime, both by reporting their own observation of Wilkey and by reporting his alleged statements to them about his commission of the crime. *Fulcher* thus is readily distinguishable from our case, and it is of no avail to Wilkey.

For these reasons, the court determines that the jury was not "substantially and injurious[ly]" influenced by the erroneous admission of Mrs. Tellas's deposition testimony, " *Brecht*, 507 U.S. at 623. In light of the very strong evidence against Wilkey from many other sources, the guilty verdict was "surely unattributable" to the Confrontation Clause error, *see Doan*, 548 F.3d at 459 (quoting *Sullivan*, 508 U.S. at 279). In short, "the new trial would look like the old trial – which is the epitome of a harmless and therefore uncorrectable error on habeas review." *Desai v. Booker*, 538

---

the Michigan Court of Appeals' decision affirming Wilkey's conviction.

F.3d 424, 428 (6th Cir. 2008) (Sutton, J.) (citing *Brecht*, 507 U.S. at 638), *reh'g & reh'g en banc denied* (6th Cir. Dec. 1, 2008).


## DISCUSSION: Ineffective Assistance of Trial Counsel

Wilkey's habeas petition contends that trial counsel rendered constitutionally ineffective assistance (1) by failing to object to the prosecution's "vouching" for codefendant Richard Brockless's credibility; (2) by failing to object or to move for a mistrial after his codefendant disclosed to the jury that Wilkey had been involved with him in an unrelated home invasion; and (3) by eliciting Wilkey's admission that he had been previously convicted of felon in possession of a firearm. The Magistrate Judge is correct that in rejecting Wilkey's three ineffective-assistance claims, the Michigan Court of Appeals did not rule contrary to, or unreasonably apply clearly established federal law as determined by the holdings of the U.S. Supreme Court precedent, nor did it unreasonably determine any facts in light of the evidence, *Colwell*, 2009 WL 125223 at *2 (citing 28 U.S.C. § 2254(d)).

To prevail on an ineffective-assistance claim, Wilkey has to show that his counsel's performance fell below an objective standard of reasonableness (the "performance" prong) and that the deficient performance prejudiced him and resulted in an unreliable or fundamentally unfair outcome (the "prejudice" prong). *Beeman v. Berghuis*, 2008 WL 4820500, *7 (W.D. Mich. Oct. 30, 2008) (Maloney, C.J.) (citing *Strickland*, 466 U.S. at 687-88). On the performance prong, this court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, *Fields v. Quigley*, 2008 WL 4562211, *6 (W.D. Mich. Oct. 8, 2008) (citing *Strickland*, 466 U.S. at 689), even if counsel's performance was less than optimal or some of his

tactical decisions debatable. On the prejudice prong, the petitioner must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Leatherman v. Palmer*, 583 F. Supp.2d 849, 864 (W.D. Mich. 2008) (citing *Strickland* 466 U.S. at 694), *stay den.*, 2008 WL 5062902 (W.D. Mich. Nov. 26, 2008)).[9]

Although this is a high burden for a petitioner to satisfy, it is even higher for a petitioner proceeding under the AEDPA:

> "'For [a petitioner] to succeed, . . . he must do more than show that he would have satisfied *Strickland*'s test if claim were being analyzed in the first instance, because under [28 U.S.C.] § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, he must show that the [state] Court of Appeals applied *Strickland* to the facts of his case in an objectively unreasonable manner.'"

*Ruiz v. Birkett*, 2008 WL 4372846, *25-26 (W.D. Mich. Sept. 23, 2008) (Maloney, C.J.) (quoting *Carter v. Mitchell*, 443 F.3d 517, 525 (6th Cir. 2006) (quoting *Bell v. Cone*, 535 U.S. 685, 698-99 (2002))), *cert. denied*, 549 U.S. 1127 (2007).

**First, Wilkey complains that Wilkey contended that trial counsel was constitutionally ineffective by failing to object to the prosecutor's vouching for his co-defendant's credibility.** Improper vouching occurs either when (1) the prosecutor bluntly states his belief in the witnesses's credibility, "thereby placing the prestige of the office of the United States Attorney behind that witness", or (2) the prosecutor implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury. *US v. Henry*, 545 F.3d 367, 378-79 (6th Cir. 2008) (quoting *US v. Francis*, 170 F.3d 546, 550-51 (6th Cir. 1999)).

---

9

"When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'" *Beeman*, 2008 WL 4820500 at *7 (quoting *Campbell v. US*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697)); *see, e.g., Wicker v. Palmer*, 2008 WL 4425604, *28 (W.D. Mich. Sept. 26, 2008) (Miles, J.).

As the Magistrate Judge correctly noted, Wilkey does not accuse the prosecution of either of these recognized types of improper vouching. *See* R&R at 21. Rather, Wilkey objects to the prosecution's questions to Brockless about the terms of Brockless's plea agreement, including the requirement that he testify truthfully at trial or risk voiding the agreement. *See* Wilkey's Objection at 7-8.

Relying on Michigan Supreme Court precedent, the Michigan Court of Appeals held that "[t]estimony regarding a plea agreement containing a promise of truthfulness does not, in itself, constitute grounds for reversal. " *State v. Wilkey*, 2004 WL 576659, *3 (Mich. App. Mar. 23, 2004) (p.c.) (P.J. Murray, Murphy, Markey) (citing *People v. Bahoda*, 531 N.W.2d 659 (Mich. 2005)). In Wilkey's case, the Michigan Court of Appeals determined, "There was no express or implicit suggestion by the prosecutor that he had information unknown to the jury establishing that Brockless was testifying truthfully. The prosecutor did not express a personal opinion or send a message to the jury with respect to Brockless' veracity." *Wilkey*, 2004 WL 576659 at *3.[10]

Wilkey asserts that because "Brockless had already received leniency from the prosecutor before testifying 'truthfully'[, that] effectively disclosed that the prosecutor had already decided his anticipated testimony would be the truth." Objection at 8. But Wilkey identifies no United States Supreme Court decision holding that a mere reference to a cooperating witness's plea agreement, and its requirement that he testify truthfully at trial, constitutes impermissible prosecutorial vouching

_____

[10]

It appears that federal courts in our circuit have rarely, if ever, granted habeas relief on the basis of improper vouching by a prosecutor. *See Smith v. Jones*, 326 F. App'x 324, 328 (6th Cir. 2009) (C.J. Boggs, Cole, Cook) ("Prosecutorial vouching rarely warrants a new trial.") (citations omitted); *Sok v. Romanowski*, 2008 WL 4587122, *20 (W.D. Mich. Oct. 14, 2008) (Bell, J.) ("The Sixth Circuit has stated that it has 'not discovered . . . any cases in which we have granted habeas relief on the basis of improper vouching.'") (quoting *Byrd v. Collins*, 209 F.3d 486, 536 (6th Cir. 2000)).

in violation of some federal right. This is fatal to his argument, because a federal habeas court cannot reverse a state court unless the petitioner shows that the state court's ruling was contrary to, or unreasonably applied, clearly established law *as determined solely by the holdings of United States Supreme Court decisions. See Mattox v. Davis*, 549 F. Supp.2d 877, 925-25 (W.D. Mich. Mar. 17, 2008) (Bell, C.J.) ("[H]owever, the district court may not refer to decisions of lower federal courts in determining whether the state courts have issued a decision that was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court. In the present case, it is impossible to identify a Supreme Court decision that clearly establishes the principle that remarks of a prosecutor commenting on credibility violate the federal Due Process Clause.") (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000) for first proposition).

Moreover, our Court of Appeals clearly does not believe that U.S. Supreme Court precedent requires *vacatur* of a conviction based on a prosecutor eliciting testimony from a witness about his plea-agreement obligation to testify truthfully. This is apparent from *US v. Beard*, 318 F. App'x 323 (6th Cir. 2008) (Martin, Norris, N.D. W.Va. D.J. Frederick Stamp), *cert. denied*, – U.S. –, 129 S.Ct. 2068 (2009), which followed published precedent. The *Beard* panel reasoned as follows:

> Beard complains that the government improperly vouched for the credibility of cooperating witnesses by eliciting questions on direct examination about their obligations, pursuant to their plea agreements, to testify truthfully. Beard points in particular to the prosecutor's examination of Willie Frazier. Although the prosecutor emphasized the obligation of cooperating witnesses in general, and Willie Frazier in particular, to provide truthful testimony, he did not make any blatant statements of personal opinion regarding the credibility of those witnesses.
>
> In his questions to Frazier about his plea agreement, the prosecutor elicited testimony that Frazier understood that, under the terms of his plea agreement, he would fully cooperate with the government by testifying at trial and that if he testified untruthfully he would be prosecuted. The prosecutor also reviewed in detail the terms of the proffered letter that Frazier signed prior to signing the plea agreement. The prosecutor highlighted Frazier's "obligation to do nothing other than candidly

reveal the whole truth about all matters relevant to [his] potential as a witness." He also reviewed the government's promise that "nothing said or revealed by [Frazier] during the attempted negotiation of [a plea agreement] would be used against [Frazier] as long as [he] tell[s] the truth."

We do not believe that the prosecutor's questioning in this regard was outside the bounds of propriety. Indeed, *a prosecutor is permitted to* "elicit testimony about [a plea agreement's] terms, attack the credibility of the witness because of it and even *refer to a plea agreement of a government witness in an attempt to deflect defense counsel's use of the agreement to attack the witness's credibility.*

*Beard*, 318 F. App'x at 326-27 (citing *US v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)) (some

paragraph breaks added) (emphasis added).

Likewise, in *US v. Owens*, 426 F.3d 800 (6th Cir. 2005), *cert. denied*, 546 U.S. 1119 (2006),

our Court of Appeals explained that a prosecutor's right to refer to a witness's plea-agreement

obligation to testify truthfully does *not* turn on whether the defense has first used the existence of

the agreement to imply that the witness is lying in exchange for favorable treatment from the

government. The *Owens* panel explained as follows,

During closing argument, one prosecutor referred to the plea agreements signed by several Government witnesses, Owens's accomplices in the robberies, which condition federal immunity on their truthful testimony at trial. * * *

The prosecutor uttered his statement in response to defense counsel, who, in her closing, suggested that each Government witness had "some motivation" to testify falsely in light of an "obligation" or "plea agreement." When a defendant attacks the credibility of a government witness for signing a plea agreement, the prosecution is entitled to refer to the agreement in rebuttal. * * *

*Even where the defense did not mention the plea agreement, this Court condones its reasonable use by the prosecution. See United States v. Trujillo*, 376 F.3d 593 (6th Cir. 2004). In *Trujillo*, for instance, the government revealed the terms of two witnesses' plea agreements; among the conditions of the plea were that the witnesses testify truthfully at trial. Because "the prosecutor did not offer any personal observations or opinions as to the veracity of either [witness], nor . . . place the prestige of the government behind [witness] credibility" this Court found that "the government did not engage in improper vouching." *Id.* at 608-09.
* * *

-27-

> Generally speaking, "improper vouching includes either blunt comments or comments that imply that the prosecutor has special knowledge of facts not in front of the jury." *Francis*, 170 F.3d at 550 . . . *see, e.g., Carroll*, 26 F.3d 1380, 1387 (holding [that] the prosecutor's statement – "'I submit to you that [the witnesses] are credible" – [was] improper). *The prosecutor in the instant case merely referred to the plea agreement, per his right. We therefore find no ground for reversal.*

*Owens*, 426 F.3d at 806-807 (emphasis added).

Trial counsel's "failure" to make a meritless objection on the vouching issue was not outside the range of reasonable professional assistance, so Wilkey cannot satisfy the first prong (the performance prong) of *Strickland*. Nor can he satisfy *Strickland*'s second prong, the prejudice prong: "An attorney's failure to make an . . . objection will not alter the outcome of a proceeding if the objection is meritless, and hence would not be sustained." *Lockhart v. Fretwell*, 506 U.S. 364, 380 n.6 (1993) (Stevens, J., dissenting on other grounds, joined by Blackmun, J.); *see, e.g., Burton v. Renico*, 391 F.3d 764, 780 (6th Cir. 2004) ("[A] constitutional claim based on the absence of an instruction regarding mitigation or justification in this case lacks merit, so it cannot be said that failure to raise such an objection on appeal constituted ineffective assistance of appellate counsel . . . ."); *cf. Ashe v. Jones*, No. 98-1324, 208 F.3d 212, 2000 WL 263342, *4 (6th Cir. Feb. 29, 2000). ("Kujenga's trial counsel was not required to make a meritless objection to its admission."). In other words, "counsel cannot be deemed ineffective for failure to raise a meritless objection." *Miller v. US*, 2008 WL 4820776, *5 (E.D. Mich. Nov. 5, 2008) (Lawson, J.) (citing *Norris v. Schotten*, 146 F.3d 314, 336 (6th Cir. 1998)).

Accordingly, Wilkey's first ineffective-assistance claim provides no basis for federal habeas relief under AEDPA.

**Second, Wilkey complains that his trial counsel should have objected or moved for a mistrial after his codefendant disclosed, in front of the jury, that Wilkey had been involved in**

**one or more unrelated home invasions.**  As explained by the R&R at 23-24, the Michigan Court

of Appeals did not rule contrary to or unreasonably apply the holdings of any United States Supreme

Court decisions in ruling that because "there was proper testimony admitted showing that defendant,

Brockless, and Councilor were planning to break into the Tellas's home", a mistrial was not

warranted by "[t]wo brief references to those same individuals committing other B&Es hardly seem

noteworthy" did not so prejudice Wilkey as to give rise to a reasonable probability that the outcome

would have been different if he were tried without the jury hearing the references to the statements

implying Wilkey's involvement in prior B&Es.  This court agrees that, in light of the other very

strong evidence against Wilkey from evidence and testimony whose admission has not been

challenged, *see supra* and R&R at 24-25, he has not satisfied *Strickland*'s prejudice prong.

Brockless's references to prior B&Es were quick and cursory, incidental to the main thrust of his

testimony, were not repeated later at trial by Brockless or anyone else, and were not commented on

by the prosecution in examination of witnesses or in closing argument.  Accordingly, Wilkey's

second ineffective-assistance claim provides no basis for federal habeas relief under AEDPA.

       **Third, Wilkey complains that his trial counsel was constitutionally deficient when he**

**caused the jury to learn of Wilkey's inadmissible unrelated prior conviction for being a felon**

**in possession of a firearm.**  Assuming *arguendo* that Wilkey's trial counsel rendered deficient

performance by asking him whether he had a 1995 conviction for being a felon in possession of a

firearm, Wilkey has not identified any United States Supreme Court holdings that the Michigan

Court of Appeals ruled contrary to, or unreasonably applied, by holding that there was not a

reasonable probability of a different outcome if he were tried without discussion of his prior felony

convictions (the felon in possession of a firearm, and whatever earlier underlying felony formed the

predicate for *that* conviction). Accordingly, Wilkey's third ineffective-assistance claim provides

no basis for federal habeas relief under AEDPA.

### Cumulative Error Doctrine Not Available On Federal Habeas Review

Finally, Wilkey contends that the R&R, and the Michigan courts, failed to consider the

*cumulative* effect of all constitutional errors in his trials, rather than merely considering the effect

of each error in isolation. *See* Objections at 9-10. But

> such a claim is not a basis for habeas relief. Although Sixth Circuit precedent
> supports the proposition that errors that are harmless in isolation may require reversal
> when taken together, *see United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir.
> 2000) . . . , no United States Supreme Court precedent recognizes the cumulative
> error doctrine.[11] Under the AEDPA, a court only may grant [sic] habeas relief based
> on a misapplication of Supreme Court law. *Bailey*, 271 F.3d at 655.

*Hall v. McKee*, 2008 WL 718140, *38 (W.D. Mich. Mar. 14, 2008) (Miles, J.), *COA den.*, 2008 WL

---

[11]

The terms "cumulative error" and "cumulative errors" do not appear in any United States Supreme Court decision that is available on WestLaw. The term "accumulated errors" appears once in the Supreme Court's decisions, but only as a reference to "the taxpayer's accumulated errors." *See Virginia Hotel Corp. of Lynchburg v. Helvering (IRS)*, 319 U.S. 523 (1943).

The U.S. Supreme Court has used the term "cumulative effect" in reference to multiple alleged federal constitutional errors, but never in a way that countenances cumulative-error analysis on direct or collateral review. *See Banks v. Dretke*, 540 U.S. 668, 688-89 (2004) (noting in passing, "In addition, the Fifth Circuit observed, the Magistrate Judge had relied on the cumulative effect of *Brady* error and the ineffectiveness of Banks's counsel at the penalty phase. Banks, himself, however . . . had argued *Brady* and ineffective assistance of counsel discretely, not cumulatively."); *Tomaiolo v. US*, 1961 WL 64071 (U.S. Nov. 21, 1961) (Mem., not in U.S. or S.Ct. reporters) (Harlan, J.) (single Justice notes that in the first of the petitioner's four trials, "the Court of Appeals reversed [the conviction] because of the *cumulative effect* of various trial errors").

Finally, the Supreme Court holds that in determining whether evidence not disclosed by the State was "material", a court should consider the cumulative effect of all suppressed evidence favorable to the defendant, rather than considering the effect of each suppressed item individually. *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995). This rule is inapposite here.

1808810 (W.D. Mich. Apr. 21, 2008); *see also Millender v. Adams*, 376 F.3d 520, 529 (6ᵗʰ Cir.

2004) ("we reiterate that '[t]he Supreme Court has not held that distinct constitutional claims can

be cumulated to grant habeas relief.'") (quoting *Lorraine v. Coyle*, 291 F.3d 416, 447 (6ᵗʰ Cir.),

*corrected o.g. on denial of reh'g*, 307 F.3d 459 (6ᵗʰ Cir. 2002)); *Cross v. Stovall*, 238 F. App'x 32,

41 (6ᵗʰ Cir.) ("[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas

because the Supreme Court has not spoken on this issue.") (citing *Williams v. Anderson*, 460 F.3d

789, 816 (6ᵗʰ Cir. 2006) (citing *Moore v. Parker*, 425 F.3d 250, 256 (6ᵗʰ Cir. 2005))), *cert. denied*,

– U.S. –, 128 S.Ct. 454 (2007).


In any event, under the AEDPA standard, the trial violated Wilkey's federal constitutional

rights in only one respect – the Confrontation Clause violation when the trial court admitted Mrs.

Tellas's deposition testimony – so there are no other federal constitutional errors to consider for

cumulative prejudicial effect.


### ORDER

Wilkey's objections [document # 31] are **OVERRULED.**

The R&R [document # 30] is **ADOPTED as modified.**[12]

Wilkey's petition for a writ of habeas corpus is **DENIED.**

A separate judgment will issue as required by FED. R. CIV. P. 58.

This is a final order, but it is only partially appealable.

---

[12]This court adopted the R&R except for its conclusion that the admission of Mrs.
Tellas's testimony did not violate Wilkey's Sixth Amendment confrontation rights.

**The court ISSUES a certificate of appealability as to its determination that the Confrontation Clause error was harmless.**

**The court DENIES a certificate of appealability as to all other issues**, including its rejection of Wilkey's ineffective-assistance-of-counsel claims and his cumulative-error claim.[13] [14]

**IT IS SO ORDERED this __28th__ day of September 2009.**

/s/ Paul L. Maloney
Honorable Paul L. Maloney
Chief United States District Judge

---

[13]

The U.S. Supreme Court disapproves of blanket denials of certificates of appealability. *See Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, this court "must 'engage in a reasoned assessment of each claim' to determine whether a certificate is warranted." *Oatis v. Caruso*, 2009 WL 80347, *4 (W.D. Mich. Jan. 8, 2009) (Maloney, C.J.) (citing *Murphy*, 263 F.3d at 467).

Wilkey is entitled to a COA on the Confrontation Clause issue because, while it is unlikely, other reasonable jurists might find this court's assessment of that claim to be unreasonable or wrong, *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). This means only that "jurists could conclude the issues presented are adequate to deserve encouragement to proceed further," *Butz v. Berghuis*, 2009 WL 33462, *6 (W.D. Mich. Jan. 5, 2009) (Maloney, C.J.) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)). *See also Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir.) (p.c.) (Siler, Cole, Cook) (citing *Banks v. Dretke*, 540 U.S. 668, 674 (2004)), *cert. denied*, – U.S. –, 129 S.Ct.1057 (2009).

Issuance of a COA does not depend on or imply a prediction that the petitioner is likely to succeed on appeal, *Wardlaw v. Howes*, 575 F. Supp.2d 820, 821 (W.D. Mich. 2008) (Maloney, J.) (citing, *inter alia*, *Miller-El*, 537 U.S. at 337, and *Walker v. Carlton*, 114 F. App'x 687, 690 (6th Cir. 2004) ("It is consistent with [28 U.S.C.] § 2253 that a certificate of appealability will issue in some instances where there is no certainty of ultimate relief.")).

[14]

A district court's denial of a COA as to some or all claims is not appealable. *Sims v. US*, 244 F.3d 509, 509 (6th Cir. 2001) ("[W]e hold that an order denying a certificate of appealability is not appealable."), *followed by Crowley v. Renico*, 81 F. App'x 36, 37 (6th Cir. 2003) and *US v. Badru*, 2008 WL 1683113, *1 (D.C. Cir. July 27, 2004) (p.c.) (Rogers, Tatel, John Roberts).

The U.S. Court of Appeals, however, may grant rehearing of *its own* denial of an application for a COA. *See Sherwood v. Prelesnik*, – F.3d –, –, 2009 WL 2778218, *1 (6th Cir. Sept. 3, 2009).